## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MICHAEL BRAUSER, an individual, DRU SCHMITT, an individual, and MICHAEL HERMAN, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> SUNAIR SERVICES CORPORATION, COCONUT PALM CAPITAL INVESTORS II, LTD., and COCONUT PALM CAPITAL INVESTORS II, INC., <br><br> Defendants. | Civil Action No. <br><br> **09-CV-80438-Cohn-Seltzer** <br><br><br> FILED by *VT* D.C. <br> ELECTRONIC <br><br> **March 17, 2009** <br><br> STEVEN M. LARIMORE <br> CLERK U.S. DIST. CT. <br> S.D. OF FLA. - MIAMI |

## NOTICE OF REMOVAL

Defendant Sunair Services Corporation ("Sunair"), by its undersigned counsel, respectfully notifies the Court under 28 U.S.C. §§ 1331, 1367, 1441, and 1446, that it hereby removes this action from the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida to the United States District Court for the Southern District of Florida.

## BACKGROUND

1. On February 23, 2009, Plaintiffs filed this action in the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida. It was assigned Civil Action No. 50 2009 CA 006340 XXXX MB. In accordance with 28 U.S.C. § 1446(a), a copy of the Summons, Complaint, and all other documents served on Defendants are attached as Exhibit A.

2.   Sunair was served on February 27, 2009.  This Notice of Removal is therefore timely under 28 U.S.C. § 1446(b) because it is filed no later than 30 days after the earliest effective date of service.

## BASES FOR REMOVAL JURISDICTION

3.   <u>Exclusive federal jurisdiction</u>.  This action is a civil action over which this Court has original jurisdiction under  28 U.S.C. § 1331  and is one which may be removed to this Court by Defendants pursuant to 28 U.S.C. § 1441(a) in that Plaintiffs assert claims under the Securities Exchanges Act of 1934 ("Securities Exchange Act"), 15 U.S.C. § 78a *et seq*.  *See* 15 U.S.C. § 78aa.

4.   <u>Supplemental Jurisdiction.</u>  To the extent that any of Plaintiffs' claims lack an independent basis for original federal jurisdiction, this Court has supplemental jurisdiction over such claims because they are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  *See* 28 U.S.C. § 1367.

## EXCLUSIVE FEDERAL JURISDICTION

5.   Plaintiffs' Complaint effectively alleges various violations of Section 14(a) and 14(c) of the Securities Exchange Act, 15 U.S.C. §78n(a) and §78n(c), and the rules and regulations thereunder that govern the solicitation of proxies from shareholders and the form of proxy statements.

6.   Accordingly, this Court has exclusive federal jurisdiction over this action pursuant to 15 U.S.C. § 78aa.  *See Matsushita Electric Industrial Co., Ltd.,* 516 U.S. 367, 381, 116 S.Ct. 873, 881, (1996)(recognizing that federal district courts have exclusive jurisdiction of all suits in equity and at law brought to enforce any duty or liability created by  Securities

2

Exchange Act or the rules and regulations thereunder); *Evans v. Dale,* 896 F.2d 975, 978 (5th Cir. 1990)(jurisdiction over Securities Exchange Act claims is exclusively federal); *Kinsey v. Nestor Exploration Ltd.-1981 A,* 604 F.Supp. 1365, 1368 (E.D. Wash. 1985)(federal district courts have exclusive jurisdiction of violations of the Securities Exchange Act and regulations promulgated thereunder).

7.   In particular, plaintiffs allege that a proxy statement that Sunair filed with the SEC and distributed to its shareholders pursuant to Section 14(a) of the Securities Exchange Act contains numerous alleged misrepresentations and omissions of material fact regarding Sunair's current directors and officers. *See Complaint, ¶¶ 46-47, 50, 52 and Exhibit "D".*  A copy of the proxy statement is attached as Exhibit D to Plaintiffs' Complaint.

8.   Plaintiffs further allege that Sunair has refused to provide them with a current list of, and pre-addressed mailing labels for, Sunair's current shareholders, thereby preventing Plaintiffs from being able to hold a special meeting of the shareholders of Sunair in compliance with the requirements of Section 14(c) and Securities Exchange Commission ("SEC") Rule 14c-2, 17 C.F.R. §240.14c-2. *See Complaint, ¶¶ 31-36 and 39 - 41.*

9.   Among the relief Plaintiffs seek is: (a) a preliminary injunction ordering Sunair to cease and desist from allegedly disseminating false information to its shareholders and the SEC; and (b) a declaratory judgment determining that Sunair must provide Plaintiffs with a full and complete list of all shareholders of Sunair, together with pre-addressed mailing labels to each shareholder, so that Plaintiffs may comply with the requirements of Section 14(c) of the Securities Exchange Act and SEC Rule 14c-2.

10.  Plaintiffs' claims and relief sought are clearly founded on duties created and imposed by the Securities Exchange Act, even though the complaint fails to expressly charge the

3

Defendants with violations thereunder. Accordingly, jurisdiction for Plaintiffs' claims lies exclusively in the United States district courts.   *See Herman v. Solomon Smith Barney,* 266 F.Supp.2d 1208, 1211 (S.D. Cal. 2003)(federal court had exclusive jurisdiction of complaint based on violations of Municipal Securities Rulemaking Board rules authorized by the Securities Exchange Act; under artful pleading rule, a plaintiff may not defeat removal to federal court by omitting to plead necessary federal questions in a complaint; complaint made clear that, at a minimum, plaintiff's right to relief depended on the resolution of a substantial, disputed federal question under Securities Exchange Act); *Community National Bank & Trust Co.,* 330 So.2d 211, 215 (3d DCA 1976)(where allegations in complaint show that the action is predicated on defendants' alleged violations of restrictions or duties imposed by the Securities Exchange Act or regulations thereunder, the failure of the complaint to refer thereto or expressly charge defendants with the violations thereunder, will not operate to avoid the provision of the federal act by which jurisdiction for any action so founded lies exclusively in the federal district courts).

## SUPPLEMENTAL JURISDICTION

11. To the extent that any of Plaintiffs' claims lack an independent basis for original federal jurisdiction, this Court has supplemental jurisdiction over those claims under 28 U.S.C. § 1367 because they are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## NOTICE

12. In accordance with 28 U.S.C. § 1446(d), Defendants will promptly file a copy of this Notice of Removal with the clerk of the Circuit Court of the Fifteenth Judicial Circuit, in

4

and for Palm Beach County, Florida, and will serve a copy of the same upon counsel for the

Plaintiffs.

Respectfully submitted,

Dated:  March 17, 2009

Robert S. Hackleman
Florida Bar No. 248041
rhackleman@gunster.com
Linda A. Conahan
Florida Bar No. 252743
lconahan@gunster.com
Christopher W. Kammerer
Florida Bar No. 0042862
ckammerer@gunster.com
GUNSTER, YOAKLEY & STEWART, P.A.
450 East Las Olas Blvd.
Suite 1400
Fort Lauderdale, FL  33301
Telephone: (954) 462-2000
Facsimile: (954) 523-1722
Attorneys for Defendant

FTL 356557.1

5

| X ☐ | IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA. IN THE COUNTY COURT IN AND FOR PALM BEACH COUNTY, FLORIDA. | |
|---|---|---|
| **CIVIL DIVISION** | **CIVIL ACTION SUMMONS** Service on a Corporation **30 2009 CA 0063 40 XXXX** | **CASE NUMBER** |
| **PLAINTIFF(S)** MICHAEL BRAUSER, an individual; DRU SCHMITT, an individual; and MICHAEL HERMAN, an individual | VS. **DEFENDANT(S)** SUNAIR SERVICES CORPORATION; COCONUT PALM CAPITAL INVESTORS II. LTD.; and COCONUT PALM CAPITAL INVESTORS II, INC. | **CLOCK IN** |
| To Defendant(s): SUNAIR SERVICES CORPORATION , by serving its Registered Agent, EDWARD M. CARRIERO. | Address: 595 SOUTH FEDERAL HIGHWAY #500 BOCA RATON, FLORIDA 33432 | |

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with the clerk of this circuit court. A phone call will not protect you; your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

**CLERK OF COURTS**
Palm Beach County Courthouse
205 N. Dixie Highway
West Palm Beach, FL 33401

2/27/09        11 00 P₁

CONNIE KELCO
ATA

CPS/JN2 Trompty

Additional Court locations are printed on the back of this form.

You must also mail or take a copy of your written responses to the "Plaintiff/Plaintiff's Attorney" named below

| Plaintiff/Plaintiff Attorney ANDREW C. HALL, ESQ. | Address: Hall, Lamb and Hall, P.A. 2665 South Bayshore Drive Penthouse 1 Miami, Florida 33133 |
|---|---|

TO EACH SHERIFF OF THE STATE OF FLORIDA: You are commanded to serve this Summons and a copy of the Complaint in this lawsuit on the above named defendant.

**EXHIBIT**

**A**

| | Court Seal | NAKIA ULYSSE | DATE | FEB 2 3 2009 |
|---|---|---|---|---|
| **CLERK OF COURTS** | BY:_____ | | SHARON R. BOCK | |
| | DEPUTY CLERK | | Clerk & Comptroller | |
| | | | P.O. Box 4667 | |
| | | | West Palm Beach, Florida | |
| | | | 33402-4667 | |

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene 20 dias contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el case y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, usted puede consultar in un abogado immediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presente su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona demoninada abajo como "Plaintiff/Plaintiff Attorney" (Demandante o Abogado del Demandante).

---

**IMPORTANT**

Des poursuites judiciaires ont été entreprises contre vous. Vous avez 20 jours consécutifs à partir de la date de l'assignation de cette citation pour déposer une réponse écrite à la plainte ci-jointe auprès de ce tribunal. Un simple coup de téléphone est insuffisant pour vous protéger. Vous êtes obligé de déposer votre réponse écrite, avec mention du numéro de dossier ci-dessus et du nom des parties nommées ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne déposez pas votre réponse écrite dans le délai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent être saisis par la suite, sans aucun préavis ultérieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requérir les services immédiats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez téléphoner à un service de référence d'avocats ou à un bureau d'assistance juridique (figurant à l'annuaire de téléphones)

Si vous choisissez de déposer vous-même une réponse écrite, il vous faudra également, en même temps que cette formalité, faire parvenir ou expédier une copie de votre réponse écrite au "Plaintiff or Plaintiff's Attorney" (Plaignant ou à son avocat) nommé ci-dessous.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION

CASE NUMBER: _____

Michael Brauser, an individual; Dru Schmitt,
an individual; and Michael Herman, an
individual,

    Plaintiffs,

v.

Sunair Services Corporation; Coconut Palm
Capital Investors II. Ltd.; and Coconut Palm
Capital Investors II, Inc.,

    Defendants

_____/

## COMPLAINT

For their complaint, plaintiffs, Michael Brauser, an individual ("Mr. Brauser"); Dru

Schmitt, an individual ("Mr. Schmitt"); and Michael Herman, an individual ("Mr. Herman");

state:

### Jurisdiction, Venue and Parties

1.    This is an action: i) for relief under Florida Statutes Section 607.1602(2) by three

shareholders of Sunair Services Corporation, a Florida corporation ("Sunair") to force Sunair, its

Board of Directors and its management to turnover to those shareholders a full and complete list

of all shareholders of Sunair, as of a date certain, together with pre-addressed mailing labels to

each shareholder, so that the three shareholders, and others, may meet and/or exercise their

written consent to remove present members of the Board of Directors of Sunair and appoint new

directors; ii) to declare that certain versions of a Proxy and Power of Attorney are a nullity by

their own terms and conditions; and iii) to enjoin Sunair's distribution of false and misleading

{972590010768 9.2}

1

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

8 of 93

proxy materials to the shareholders of Sunair that, among other things, support the reelection of Richard C. Rochon ("Mr. Rochon") to the Sunair Board of Directors notwithstanding that through self-dealing, Mr. Rochon and persons affiliated with him are using Sunair for their personal expenses and financial benefit to the detriment of Sunair's shareholders.

2.     Venue is appropriate in Palm Beach County because it is the location of the corporate headquarters of defendants, Sunair; Coconut Palm Capital Investors II, Ltd. ("Coconut Palm"); and Coconut Palm Capital Investors II, Inc. ("Coconut Inc.").

3.     Mr. Brauser is a citizen of the State of Florida; he maintains an office in Boca Raton, FL; and he has beneficial ownership of 1,403,300 shares of Sunair, representing approximately 10.2% of the 13,091,088 shares of Sunair presently outstanding among shareholders of Sunair ("Outstanding Shares").

4.     Mr. Herman resides in Colorado Springs, CO and has beneficial ownership of 2,180,600 shares of Sunair, representing approximately 16.7% of the Outstanding Shares.

5.     Mr. Schmitt resides in St. Louis, MO and has beneficial ownership of 1,486,014 shares of Sunair, representing approximately 11.1% of the Outstanding Shares.

6.     Sunair, Coconut Palm and Coconut Inc. have their principal places of business in Boca Raton, Florida in Palm Beach County, Florida.

7.     Plaintiffs met all conditions precedent to bringing this action or the conditions have been waived.

### Plaintiffs' SEC Filings

8.     Pursuant to Section 14(c) of the Securities Exchange Act of 1934 ("'34 Act"), Mr. Brauser, Mr. Schmitt and Mr. Herman filed a preliminary Schedule 14C Information Statement ("SEC Information Statement") with the U. S. Securities and Exchange Commission ("SEC").

{9725\00107689.2}

2

9.    A true and correct copy of the SEC Information Statement is attached hereto as Exhibit A and incorporated herein.

10.    As detailed by the SEC Information Statement, Mr. Brauser, Mr. Schmitt and Mr. Herman and others intend to consent to the removal of certain directors of Sunair and appoint new directors.

11.    Appointment of new directors to Sunair's Board of Directors in connection with the removal of the current directors will cause a change in the majority of the directors, thereby causing a need to send information to Sunair's shareholders in order to comply with the ten-day notice provision of Florida Statutes Section 607.0705(1), as incorporated for special meetings by Florida Statutes Section 607.0702(3).

## Special Meetings Under Sunair's Bylaws

12.    Under Article Two, Section Three, of the Amended and Restated Bylaws of Sunair, as adopted by the Sunair Board of Directors as of December 18, 2007 ("Bylaws"), any shareholder holding not less than ten percent of all shares entitled to vote at a meeting may call a Special Meeting.

13.    Bylaws Article Two, Section Four provides that in the event of a Special Meeting, a written or printed notice to shareholders shall be delivered to shareholders not less than ten days before the date of the Special Meeting.

14.    Bylaws Article Two, Section Four further provides that in the event of a Special Meeting, the required shareholder notice shall state the place, day and hour of the Special Meeting, as well as the purpose or purposes for which the Special Meeting has been called.

15.    A true and correct copy of the Bylaws, as filed with the SEC by Sunair, is attached hereto as Exhibit B.

{972500107689.2}

3

16.     Sunair has refused to give plaintiffs a full and complete list of all shareholders of Sunair, as of a date certain, together with pre-addressed mailing labels to each shareholder, so that the plaintiffs, and others, may serve notice of a meeting to consider the issue of new directors or use the Information Statement to give notice to shareholders.

17.     By its conduct, Sunair has thwarted plaintiffs' rights to convene a special meeting under the applicable Bylaws cited in paragraphs 13 through 15 above.

### The Alleged Proxy of Mr. Brauser and Mr. Schmitt

18.     Mr. Brauser and Mr. Schmitt received Sunair common stock from Coconut Palm, and Coconut, Inc., its general partner.

19.     Coconut Palm and Coconut, Inc. are controlled by Mr. Rochon and others affiliated with him.

20.     Coconut Palm (and thereby its general partner, Coconut, Inc.) claims that when Mr. Brauser and Mr. Schmitt received their Sunair common stock and warrants, Mr. Brauser and Mr. Schmitt (and certain others) each executed an irrevocable proxy and power of attorney ("Proxy") in a form that Sunair filed with the SEC.

21.     Requests by legal counsel for Mr. Brauser and Mr. Schmitt to Sunair for a copy of the Proxy as signed by plaintiffs have been ignored.

22.     A true and correct copy of an example of the Proxy as filed by Sunair with the SEC is attached hereto as Exhibit C and incorporated herein.

23.     Under the terms and conditions of the Proxy, it ceased to be irrevocable when any holder thereof "transfers" their shares as that term is defined in the Proxy, and the Proxy provides that a transfer occurs when the holder thereof "offers to sell" their shares for sale to any third party.

{972500107689.2}

4

24.     Coconut Palm, Mr. Brauser and Mr. Schmitt have offered to sell their shares of

Sunair to Massey Services, Inc.

25.     Because of this offer to sell their shares, they made a "transfer" as that term is

defined in the Proxy, and thereby the Proxy has ceased to be irrevocable.

26.     Notice was sent to Coconut Palm and Coconut, Inc. by of letter that Mr. Brauser

and Mr. Schmitt consider their Proxy, if any, to be revoked.

27.     Notwithstanding this, Sunair filed a Proxy Statement with the SEC advising of a

March 18, 2009 meeting of shareholders where Coconut Palm will vote the Proxy.

28.     However, if the Proxy exists any attempt to vote on the now terminated Proxy is

wrongful.

### Florida Law on Corporate Records Review by Shareholders

29.     Florida Statutes Section 607.1602(2) provides in relevant part:

607.1602 Inspection of records by shareholders.—
                    * * *
(2) A shareholder of a corporation is entitled to inspect and copy, during regular
business hours at a reasonable location specified by the corporation, any of the
following records of the corporation if the shareholder meets the requirements of
subsection (3) and gives the corporation written notice of his or her demand at
least 5 business days before the date on which he or she wishes to inspect and
copy:                         * * *
                    (c) The record of shareholders...

30.     A shareholder may inspect the types of records specified by Florida Statutes

Section 607.1602(2) only if the requirements of subsection (3) are met. Florida Statutes Section

607.1602(3) provides:

3. A shareholder may inspect and copy the records described in subsection two
only if:
        a. The shareholder's demand is made in good faith and for a proper purpose;
        b. The shareholder describes with reasonable particularity his or her purpose and
        the records he or she desires to inspect; and

{9725\00107689.2}

5

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

12 of 93

c. The records are directly connected with the shareholder's purpose.

31.    By their legal counsel, Mr. Brauser, Mr. Herman and Mr. Schmitt have requested the right to inspect and copy the shareholder list for Sunair, as of a date certain.

32.    Plaintiffs demand to inspect these corporate records and have the pre-address mailing labels made for each shareholder is made in good faith and for a proper purpose: convening a Special Meeting under the Bylaws and meeting the requirements of Section 14(c) of the '34 Act concerning an Information Statement under rules promulgated by the SEC.

33.    Sunair refused to permit plaintiffs to inspect and copy the shareholder list.

34.    Plaintiffs have described with reasonable particularity their purpose and the records they desire to inspect.

35.    Rule 14c-2, promulgated by the SEC under the '34 Act, provides that in connection with taking corporate action by written authorization or consent of security holders, a registrant must transmit a written information statement on Schedule 14C to every security holder entitled to vote or give authorization or consent in regard to the matter acted upon and from whom authorization or consent is not solicited.

36.    Pursuant to Rule 14c-2 under the '34 Act, the proposals by Mr. Brauser, Mr. Herman and Mr. Schmitt will not be effective until 20 days after a definitive Information Statement mailed to the shareholders of Sunair.

**Count One: Against Sunair for a Shareholder List and Pre-addressed Mailing Labels**

37.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 36 above as though fully alleged herein.

38.    Bylaws Article Two, Section 14 provides that for purposes of determining the shareholders entitled to vote at a meeting of shareholders, the Sunair Board of Directors may fix

{972500107689.2}

6

in advance a date as the record date that is not less than ten days prior to the date for the particular action to be taken ("Record Date").

39. Plaintiffs need a shareholder list of shareholders as of a Record Date which reflects those shareholders entitled to vote at the Special Meeting contemplated by plaintiffs, and in order to send written notification to shareholders, plaintiffs need pre-addressed mailing labels for the Record Date shareholders in order to meet the requirements of the Bylaws, of <u>Florida Statutes</u> Section 607.0705(1), as incorporated for special meetings by <u>Florida Statutes</u> Section 607.0702(3), or to deliver the Information Statement to the Sunair shareholders as required by Section 14(c) of the '34 Act, 15 U.S.C. §§78n (c), and SEC Rule 14c-2 thereunder.

40. Sunair refused to allow inspection of or tender a current list of present Sunair shareholders as of a date certain and pre-addressed mailing labels for the Sunair shareholders.

41. Sunair's conduct could result in an inability of Mr. Brauser, Mr. Herman and Mr. Schmitt to hold a Special Meeting under the Bylaws or meet the requirements of Section 14(c) of the '34 Act, 15 U.S.C. §§78n (c), and SEC Rule 14c-2 thereunder.

**WHEREFORE,** Plaintiffs request judgment against Sunair as follows: i). determining that Sunair must tender to Plaintiffs a full and complete list of all shareholders of Sunair, as of a date certain, together with pre-addressed mailing labels to each shareholder; ii.) awarding attorneys' fees and costs to Plaintiffs; and iii.) awarding such other and further relief as this Court may deem just and proper.

**Count Two: Against Coconut Palm and Coconut, Inc. for Declaratory Judgment**

42. Mr. Brauser and Mr. Schmitt repeat and reallege the allegations contained in paragraphs 1 through 36 above as though fully alleged herein.

{9725\00\07689.2}

7

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

14 of 93

43.    A dispute has arisen as to the rights of Mr. Brauser, Mr. Schmitt, Coconut Palm, Coconut, Inc. and Sunair as to the parties' rights under the Proxy.

44.    Mr. Brauser and Mr. Schmitt are in doubt as to their rights regarding any alleged Proxy, and it is in the public interest for this Court to resolve this dispute.

**WHEREFORE,** Mr. Brauser and Mr. Schmitt request judgment against Coconut Palm and Coconut, Inc. as follows: i.) determining that the Proxy is null and void; ii.) awarding attorneys' fees and costs to plaintiffs; and iii.) awarding such other and further relief as this Court may deem just and proper.

### Count Three: Against Sunair to Enjoin a Shareholders' Meeting and the Filing and Dissemination of False and Misleading Documents in Connection with the Planned Meeting

45.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 36 above as though fully alleged herein.

46.    Sunair has scheduled a shareholder meeting for March 18, 2009 at which the present Board of Directors plans to conduct business for Sunair contrary to the wishes of plaintiffs and the new directors plaintiffs plan to elect to the Board of Directors.

47.    There is no good reason for the present Board of Directors to hold this planned meeting unless and until the membership issue on the Board of Directors is resolved.

48.    For the shareholder meeting, Sunair proposes a slate of candidates for reelection to the Board of Directors of Sunair, including present director, Mr. Rochon.

49.    Through a series of acts of self-dealing, Mr. Rochon and persons affiliated with him are systematically exploiting Sunair for their own benefit to reap financial benefits to themselves and specifically to pay personal expenses for which Mr. Rochon presently is without the financial means to pay, all to the detriment of Sunair shareholders

{9725\00107689.2}

8

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

15 of 93

50.     In connection with the shareholder meeting, Sunair has distributed written materials to Sunair shareholders that contain the following misrepresentations and omissions of material fact:

(a) Mr. Rochon is depicted by the Sunair materials as having a long-standing professional and personal relationship with well-know South Florida financier, H. Wayne Huizenga ("Mr. Huizenga");

(b) Sunair does not disclose that Mr. Huizenga sued Mr. Rochon in 2006 for over $10 million stemming from loans that Mr. Rochon has not repaid;

(c) Sunair does not disclose that Mr. Rochon was sued in December 2008 for foreclosure on a $12.5 mortgage upon which Mr. Rochon has not made any payments since August 2008;

(d) Sunair makes references to Mr. Rochon's his role as a director of Devcon, described as "a publicly-held company", but which ceased filing reports with the SEC in October 2008;

(e) Sunair reports that Mr. Rochon was Chairman and CEO of Coconut Palm Acquisition Company until June 2007, but omits to disclose that Royal Palm, hired by present Sunair management as a management firm for Sunair, has a $1,500,000 management agreement with Coconut Palm Acquisition Company, nor that Coconut Palm Acquisition Company has been known as Equity Media since April 2007, nor that Equity Media filed Chapter Eleven in December 2008; and

(f) Sunair identifies Sunair Director Mario Ferrari ("Mr. Ferrari'), another Royal Palm partner with Mr. Rochon, as chief strategic officer of Equity Media, but fails to report that Equity Media filed Chapter Eleven Bankruptcy in December 2008.

{9725\00107689.2}

9

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

16 of 93

51.    SEC Regulation S-K 401(f)(1) requires disclosure of a bankruptcy filing if a director nominee was an executive officer of the bankrupt company within two years prior to the filing and it is material to his ability or integrity.  Mr. Rochon was an executive officer within two years of the Chapter Eleven filing of Equity Media, and Mr. Ferrari was listed as an executive officer in the last Form 10-K filed by Equity Media.

52.    A true and correct copy of the relevant written materials that Sunair filed with the SEC and distributed to Sunair shareholders is attached hereto as Exhibit D.

**WHEREFORE**, plaintiffs request a preliminary injunction against Sunair: i) ordering Sunair to cease and desist from disseminating false information to shareholders and to the SEC; ii) ordering Sunair to not hold the March 18, 2009 shareholders' meeting; and iii) containing such other and further relief as this Court may deem just and proper.

DATED:  February 23, 2009.

Respectfully submitted,

HALL, LAMB AND HALL, P.A.
Attorneys for Plaintiffs
Offices at Grand Bay Plaza
Penthouse One
2665 South Bayshore Drive
Miami, FL 33133

ANDREW C. HALL
Florida Bar Number: 111480
GARY LANGAN GOODENOW
Florida Bar Number: 466522

{9725\00107689.2}

10

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

17 of 93

Exhibit A: a true and correct copy of the Information Statement

January __, 2008                                                    Page 1 of 12

PREC14C 1 sunairprec14c.htm INFORMATION STATEMENT
## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## SCHEDULE 14C INFORMATION

### Information Statement Pursuant to Section 14(c) of the Securities Exchange Act of 1934 (Amendment No. )

Check the appropriate box:

☑ Preliminary Information Statement

☐ Confidential, for Use of the Commission
Only (as permitted by Rule 14c-5(d)(2))

☐ Definitive Information Statement

## SUNAIR SERVICES CORPORATION
*(Name of Registrant as Specified in Its Charter)*

**Michael Brauser, Michael Herman and Dru Schmitt**
*(Name of Person(s) Filing Information Statement, if other than the Registrant)*

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14c-5(g) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

$_____ per share as determined under Rule 0-11 under the Exchange Act.

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount previously paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:

January __, 2008

## INFORMATION STATEMENT

### We Are Not Asking You For A Proxy And You Are Requested Not To Send A Proxy.

You are not being asked to approve anything. This Information Statement is being provided to you solely for your information.

This Information Statement is being furnished by Michael Brauser, Michael Herman and Dru Schmitt in their capacity as shareholders of Sunair Services Corporation, a Florida corporation (the "Company" or "Sunair").

This Information Statement has been filed with the Securities and Exchange Commission (the "SEC") and is being mailed or otherwise furnished to the shareholders of Sunair in connection with the written consent by the holders of the majority of the voting power of the Company's capital stock (the "Majority Shareholders"), to remove six of the seven current directors of the Company (the "Removed Directors") and appoint six new directors (the "Designated Directors"). Of the 13,091,088 total votes, the Majority Shareholders, who hold _____ votes or approximately _____% of the outstanding voting power, executed a written consent to approve the removal of the Removed Directors and the appointment of the Designated Directors. The last consent was executed on February __, 2009.

This Information Statement is also furnished by the Majority Shareholders pursuant to Rule 14f-1 under the Securities Exchange Act of 1934 (the "Exchange Act") to inform the shareholders of the Company of a proposed change in the majority of the Board of Directors.

This Information Statement is being mailed or otherwise furnished on February __, 2009 to the shareholders of the Company as of the close of business on February _____, 2009 (the "Record Date") in connection with the removal of the Removed Directors and the adding of the Designated Directors to the Board of the Company. The appointment of the Designated Directors will cause a change in the majority of the directors causing this Information Statement to be sent to our shareholders.

### Voting Required and Shareholder Approval

The elimination of the need for a meeting of shareholders to approve this action is made possible by Section 607.0704, Florida Statutes and the Company's Bylaws which provide that the written consent of the holders of outstanding shares of voting capital stock, having not less than the minimum number of votes which would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, may be substituted for such a meeting. Although another Bylaw states that directors may not be removed by consent, this Bylaw conflicts with Section 607.0704(1), Florida Statutes which states "Unless otherwise provided in the articles of incorporation, action required or permitted by this act to be taken at an annual or special meeting of shareholders may be taken without a meeting..." The Articles do not contain any limiting provision.

On February __, 2009, the approval was obtained through the written consent of the final person comprising the Majority Shareholders. Therefore, a special meeting of the shareholders to approve the removal of the Removed Directors and appoint the Designated Directors is unnecessary. If shareholders had been provided an opportunity to vote at a meeting, an affirmative vote of a majority of the outstanding voting power would also be required.

### Effective Date

The approval by Majority Shareholders will not become effective until 20 calendar days from the date of mailing of this Information Statement to our shareholders (the "Effective Date"). On the date of this Information Statement, we intend to provide the Company with the consents and mail this Information Statement on that date to those shareholders who have not consented in writing to the removal of the Removed Directors and appointment of the Designated Directors.

1

January __, 2008                                                    Page 4 of 12

**No Appraisal Rights**

Neither Florida law nor Sunair's Articles of Incorporation provide its shareholders with appraisal rights in connection with the removal and appointment of directors. This means that no shareholder is entitled to receive any cash or other payment as a result of, or in connection with removal of the Removed Directors and appointment of the Designated Directors, even if a shareholder has not been given an opportunity to vote.

**Change in Control**

Because the Majority Shareholders have executed consents for more than 50% of the outstanding shares (which represents more than 50% of the outstanding voting power of capital stock), upon effectiveness of the consents, control of Sunair may be deemed to change. At that time, Sunair will be controlled by Messrs. Michael Brauser, Michael Herman and Dru Schmitt who together beneficially own 31.9 percent of the outstanding common stock (without giving effect to the exercise of warrants they hold). In order to assert such control, they solicited consents from ___ shareholders. Mr. Brauser delivered the executed consents to Sunair on the date of this Information Statement. One of the current directors, Mr. Charles Steinmetz, is not being replaced by the Majority Shareholders.

**Change of the Board of Directors**

As of the Effective Date, other than Charles P. Steinmetz, all of the Company's directors including Joseph DiMartino, Mario B. Ferrari, Arnold Heggestad, Steven Oppenheim, Richard C. Rochon and Robert C. Griffin shall be removed as directors. Leon Brauser, Michael Brauser, Scott Frohman, Joseph Q. DiMartini, Dru Schmitt and Gregory Sturgis will be appointed to fill the Removed Directors vacancies. Mr. DiMartini, a Designated Director, should be distinguished from Mr. DiMartino a Removed Director.

**Record Date and Outstanding Shares**

Based on Sunair's Proxy Statement filed on January 28, 2009, the Designated Directors believe that as of the Record Date, there were 13,091,088 shares of Sunair common stock outstanding. The holders of shares of common stock are entitled to one vote per share on all matters for which the shareholders are entitled to vote. However, as mentioned above, no vote or action of Sunair's shareholders is required in connection with this Information Statement.

2

**Beneficial Ownership**

The following table sets forth certain information with respect to the beneficial ownership of Sunair's common stock as of the date of this Information Statement (i) those persons known to be owners of more than 5% of the Company's common stock, (ii) each director of Sunair, (iii) all named executive officers, and (iv) all executive officers and directors of Sunair as a group. The information on beneficial ownership in the table and the footnotes is based on Sunair's definitive Proxy Statement and other reports filed with the SEC, except as noted in notes to this table. The Sunair Proxy Statement refers to 9,914,700 shares beneficially owned by Coconut Palm Capital Investors II, Ltd. ("Coconut Palm"). That number may be incorrect to the extent that it includes shares of common stock and warrants owned by certain of the Designated Directors, namely Michael Brauser, Dru Schmitt, Gregory Sturgis and Leon Brauser. Those Designated Directors received their common stock and warrants from Coconut Palm and allegedly signed an irrevocable proxy, a form of which was filed by Sunair with the SEC. Requests for copies of the proxy were ignored by Sunair's counsel. In any event, based upon the language of the proxy filed with the SEC, the proxy ceased to be irrevocable when any of the holders offer their shares to any third party. These persons have offered their shares for sale to Massey Services, Inc. ("Massey") thereby making the proxies revocable. Moreover, the Form 4 filed by Coconut Palm on November 20, 2008 omits these shares and only discloses beneficial ownership of 5,278,368 shares of common stock and warrants.

| Title of Class | Name and Address of Beneficial Owner | Amount of Beneficial Ownership(1) | Percentage(1) |
|---|---|---|---|
| **Directors and Executive Officers:** | | | |
| Common Stock | Jack I. Ruff<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (2) | 0 | 0% |
| Common Stock | John J. Hayes<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (3)(4) | 736,600 | 5.5% |
| Common Stock | Edward M. Carriero, Jr.<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (2)(5)(6) | 40,625 | * |
| Common Stock | Richard C. Rochon<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (5)(7) | 5,293,368 | 28.9% |
| Common Stock | Mario B. Ferrari<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (5)(8) | 5,294,618 | 28.9% |
| Common Stock | Joseph S. DiMartino<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (5) | 70,000 | * |
| Common Stock | Arnold Heggestad<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (5) | 58,000 | * |
| Common Stock | Robert C. Griffin<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (5) | 20,000 | * |
| Common Stock | Steven P. Oppenheim<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (5) | 35,000 | * |
| Common Stock | Charles P. Steinmetz<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (5) | 439,024 | 3.3% |
| Common Stock | All directors and executive officers<br>as a group (9 persons) | 6,682,992 | 35.4% |

3

January ___, 2008

Page 6 of 12

| Title of Class | Name and<br>Address of Beneficial Owner | Amount of Beneficial<br>Ownership(1) | Percentage(1) |
|---|---|---|---|
| **5% Shareholders:** | | | |
| Common Stock | Coconut Palm Capital Investors II, Ltd.<br>595 South Federal Highway, Suite 500,<br>Boca Raton, FL 33432 (9) | 5,278,368 | 28.8% |
| Common Stock | Michael Brauser<br>595 South Federal Highway, Suite 600,<br>Boca Raton, FL 33432 (10) | 1,403,300 | 10.2% |
| Common Stock | Michael Herman<br>c/o Heat Waves<br>1160 Lake Plaza Drive, Suite 210,<br>Colorado Springs, CO 80906 | 2,180,600 | 16.7% |
| Common Stock | Dru A. Schmitt<br>13 Twin Springs Lane<br>St. Louis, MO 63124 (11) | 1,486,014 | 11.1% |
| Common Stock | Massey Services, Inc.<br>315 Groveland Street<br>Orlando, FL 32804 (12) | 1,260,972 | 9.6% |

\* Less than 1%

(1) Applicable percentages are based on 13,091,088 shares outstanding as of the Record Date adjusted as required by rules of the SEC. Beneficial ownership is determined under the rules of the SEC and generally includes voting or investment power with respect to securities. Shares of common stock subject to options, warrants and convertible notes currently exercisable or convertible, or exercisable or convertible within 60 days of the Record Date are deemed outstanding for computing the percentage of the person holding such securities but are not deemed outstanding for computing the percentage of any other person. Unless otherwise indicated in the footnotes to this table, the Designated Directors believe that each of the shareholders named in the table has sole voting and investment power with respect to the shares of common stock indicated as beneficially owned by them.

(2) An executive officer.

(3) Former executive officer.

(4) Includes 125,000 shares issuable upon currently exercisable options or options that are exercisable within 60 days of the Record Date. Includes 290,800 shares underlying warrants that are immediately exercisable. Mr. Hayes has granted Coconut Palm Capital Investors II, Inc., the general partner of Coconut Palm, the sole power to vote his shares pursuant to a proxy.

(5) Includes as to the person indicated the following currently exercisable options or options that are exercisable within 60 days of the Record Date to purchase an equal number of shares of the Company's common stock: 30,000 options held by Joseph S. DiMartino, 15,000 options held by Mario B. Ferrari, 35,000 options held Arnold Heggestad, Ph.D., 35,000 options held by Steven P. Oppenheim, 15,000 options held by Richard C. Rochon, 27,500 options held by Charles P. Steinmetz, 20,625 options held by Edward M. Carriero and 20,000 options held by Robert C. Griffin.

(6) Includes 20,000 shares held by Mr. Carriero's wife in her IRA account.

(7) Shares consist of: (i) 15,000 shares issuable upon exercise of currently exercisable options or options that are exercisable within 60 days of the Record Date; and (ii) all shares beneficially owned by Coconut Palm (assumes beneficial ownership of such shares is attributed to Mr. Rochon, and Mr. Rochon disclaims beneficial ownership of these shares).

4

(8) Shares consist of: (i) 15,000 shares issuable upon currently exercisable options or options that are exercisable within 60 days of the Record Date and (ii) all shares beneficially owned by Coconut Palm (assumes beneficial ownership of such shares is attributed to Mr. Ferrari, and Mr. Ferrari disclaims beneficial ownership of these shares).

(9) In the Company's Proxy Statement, Sunair disclosed the following:

Consists of 4,914,700 shares of our common stock and 5,000,000 shares of our common stock underlying warrants that are immediately exercisable. 9,808,197 of the 9,914,700 shares of Common Stock consist of an aggregate of 4,843,698 shares of Common Stock and 4,964,499 shares of Common Stock underlying warrants that are immediately exercisable, which Coconut Palm has the sole power to vote pursuant to proxy agreements executed by its limited partners upon the redemption of their limited partnership interests in Coconut Palm. Richard C. Rochon, Chairman of our Board of Directors, and Mario B. Ferrari, Vice Chairman of our Board of Directors, are the natural persons who exercise voting and investment control over the shares.

However, as mentioned above, the Form 4 filed by Coconut Palm on November 20, 2008 discloses beneficial ownership of 71,000 shares of common stock and 5,207,368 shares issuable upon the exercise of warrants.

(10) Includes 600,000 shares issuable upon the exercise of warrants.

(11) Includes 285,714 shares issuable upon the exercise of warrants.

(12) Massey purchased the shares from Par Investment Partners, LP, which is listed as a 5% owner in Sunair's Proxy Statement.

5

January __, 2008                                                                 Page 9 of 12

**Beneficial Ownership of Designated Directors.**

The following table sets forth certain information with respect to the Designated Directors' beneficial ownership of Sunair's common stock as of February __, 2009.

| Title of Class | Name and Address of Beneficial Owner | Amount of Beneficial Ownership (1) | Percentage (1) |
|---|---|---|---|
| **Designated Directors:** | | | |
| Common Stock | Leon Brauser<br>595 South Federal Highway, Suite 600,<br>Boca Raton, FL 33432 | 80,000 | * |
| Common Stock | Michael Brauser<br>595 South Federal Highway, Suite 600,<br>Boca Raton, FL 33432 (2) | 1,403,300 | 10.2% |
| Common Stock | Joseph Q. DiMartini<br>4 Carrswold<br>Clayton, MO 63105 (3) | 407,124 | 3.1% |
| Common Stock | Scott Frohman<br>123 NW 13th Street, Suite 300,<br>Boca Raton, FL 33432 | 4,351 | * |
| Common Stock | Dru A. Schmitt<br>13 Twin Springs Lane<br>St. Louis, MO 63124 (4) | 1,486,014 | 11.1% |
| Common Stock | Gregory Sturgis<br>595 South Federal Highway, Suite 600,<br>Boca Raton, FL 33432 | 86,000 | * |

* Less than 1%
(1) See note (1) to the Beneficial Ownership Table on page 4.
(2) Includes 600,000 shares issuable upon the exercise of warrants.
(3) Includes 50,000 shares issuable upon the exercise of warrants.
(4) Includes 285,714 shares issuable upon the exercise of warrants.

Michael Herman, one of the three people furnishing this Information Statement, beneficially owns 2,180,600 shares, or 16.7% of the outstanding shares.

**Directors**

The Board presently consists of seven members. The appointment of the Designated Directors will become effective on the 20th day following the mailing of this Information Statement to our shareholders. The Designated Directors listed below have consented to act as directors of the Company.

**Designated Directors**

*Michael Brauser* will serve as a director of the Company upon the Effective Date. Mr. Brauser has served as Co-Chairman of the Board of Directors of interCLICK, Inc. since August 28, 2007. Mr. Brauser served as Chairman of the Board of Directors of SendTec, Inc. from October 2005 through November 2006. Mr. Brauser has been the manager of Marlin Capital Partners, LLC, a private investment company, since 2003. From 1999 through 2002, he served as President and Chief Executive Officer of Naviant, Inc. (eDirect, Inc.), an Internet marketing company. He also was the founder of Seisant Inc. (eData.com, Inc.) and served as a member of its Board of Directors from 1999 through 2003. Mr. Brauser is 53 years old.

*Dru Schmitt* will serve as a director of the Company upon the Effective Date. Currently, Mr. Schmitt is a partner of Columbus Capital Partners and the Chief Technology Architect of RedCard Systems, a company founded by Columbus Capital Partners in 2006. From November 2005 until June 2006, Mr. Schmitt was associated with Royal Palm Capital Partners, Inc. ("Royal Palm"). Richard Rochon and Mario Ferrari, two of the Removed Directors, are, based upon the records of the Florida Secretary of State, officers of Royal Palm. From 1997 until

6

http://www.sec.gov/Archives/edgar/data/95366/000111650209000113/sunairrec14c.htm    2/6/2009

27 of 93

January ___, 2008

2003, Mr. Schmitt was the Chief Technology Officer of Advanced Business Fulfillment a company he co-founded. In 2003, Advanced Business Fulfillment was bought by WebMD in 2003 and Mr. Schmitt remained with WebMD until 2005. Mr. Schmitt is 40 years old.

*Joseph Q. DiMartini* will serve as a director of the Company upon the Effective Date. Currently, Mr. DiMartini is a partner of Columbus Capital Partners and the Chief Executive Officer of RedCard Systems, a company founded by Columbus Capital Partners in 2006. From 1997 until 2003, Mr. DiMartini was the Chief Executive Officer and President of Advanced Business Fulfillment a company he co-founded. In 2003, Advanced Business Fulfillment was bought by WebMD in 2003 and Mr. DiMartini remained with WebMD until 2005. Mr. DiMartini is 39 years old.

*Leon Brauser* will serve as a director of the Company upon the Effective Date. Mr. Brauser is a private investor. From November 2005 until August 2006, Mr. Brauser was a director of Health Benefits Direct Corporation. He has been retired since 1995. Mr. Brauser is 83 years old.

*Gregory Sturgis* will serve as a director of the Company upon the Effective Date. Since 1994, Mr. Sturgis has been President of the Serpentine Group, Inc., which is engaged in the yacht business. Additionally, since 1991, Mr. Sturgis has owned the Conch Inn Resort and Marina, Abaco, Bahamas. Mr. Sturgis is 57 years old.

*Scott Frohman* will serve as a director of the Company upon the Effective Date. Since June 23, 2008, Mr. Frohman has served as the Chief Executive Officer and Chairman of the Board of Options Media Group Holdings, Inc. Mr. Frohman has been Chairman of the Board of Money4Gold Holdings, Inc. since July 23, 2008. From February 2004 through December 2006, Mr. Frohman co-founded and served as the Chief Executive Officer and a director of Health Benefits Direct Corporation. Mr. Frohman is 40 years old.

**Director Independence**

The Designated Directors have determined that all of them are independent as defined by the listing standards of the American Stock Exchange. However, if Massey expresses an interest in purchasing Sunair again and it agrees to pay Michel Brauser a fee, he will not be independent. Further, to the extent that he attempts to cause Massey to consider purchasing Sunair, he would not be independent. See "Certain Relationships and Related Transactions" at page 8.

**Committees**

The Designated Directors will appoint members to the Audit, Compensation and Nominating Committees. Michael Brauser is an "Audit Committee Financial Expert" under the applicable rules of the SEC and has the accounting and related financial management expertise as required under the American Stock Exchange.

**Family Relationships**

With the exception of Michael Brauser who is the son of Leon Brauser, there are no family relationships among the Designated Directors or executive officers of Sunair.

**Legal Proceedings**

Each Designated Director knows of no material existing or pending legal proceedings or claims against him or the other Designated Directors. Nor, to the knowledge of each Designated Director, is any Designated Director a plaintiff in any material proceeding or pending litigation. To their knowledge, none of the Designated Directors or anyone else including Sunair's current officers, directors, affiliates, and no owner of record or beneficial owner of more than five percent of Sunair securities, or any associate of any such director, officer or security holder is a party adverse to Sunair or has a material interest adverse to Sunair in reference to pending litigation. To the best of each Designated Directors' knowledge, none of them has in the past five years been convicted in a criminal proceeding, excluding traffic violations or similar misdemeanors, or has been a party to any judicial or administrative proceeding during the past five years that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws, or a finding of any violation of federal or state securities laws, except for matters that were dismissed without sanction or settlement.

Case 9:09-cv-80438-JIC   Document 1   Entered on FLSD Docket 03/18/2009   Page 30 of 93

**Certain Relationships and Related Transactions**

Since October 1, 2007 and the last two fiscal years, none of the Designated Directors has engaged in any transaction with Sunair. Since about September 2008, Michael Brauser, individually and together with Dru Schmitt and Michael Herman, a 5% shareholder and one of the Majority Shareholders, has been engaged in discussions with management, counsel and others affiliated with Sunair with respect to the possible sale of Sunair to either Massey or another third party. These discussions have not been successful. Very recently, Massey withdrew an offer it made to purchase the Company for $39,273,264 cash and assumption of all liabilities, which were $29,645,606 at September 30, 2008. Mr. Brauser entered into an agreement with Massey dated September 19, 2008 through which Mr. Brauser was retained as a consultant. The offer expires March 18, 2009. Under the terms of the agreement, if Massey acquires all of the outstanding securities of Sunair or acquires substantially all of its assets, Mr. Brauser shall be paid a $1,000,000 fee. Mr. Brauser has initiated discussions with Massey to extend the term of the Consulting Agreement. None of the other Designated Directors have any interest in this Consulting Agreement. If Sunair were to consider an offer from any third party to purchase it, the Designated Directors, including Mr. Brauser, would hire an investment banking firm to review any such offer. Mr. Brauser recognizes that if he receives a fee in connection with the sale of Sunair while he is a director of Sunair, shareholders may be in a position to challenge him. Because from their perspective as shareholders, the Designated Directors want to see Sunair sold, they will retain an investment banking firm and independent counsel to advise them with respect to the future direction of the Company and rely upon the advice of these outside consultants as well as their own business judgments. Without access to material non public information concerning Sunair and without outside advice they can not predict what they will do upon becoming directors. None of the Designated Directors has any agreement or understanding on how to vote once they are directors.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires Sunair's directors and executive officers, and persons who own more than 10% of our equity securities which are registered pursuant to Section 12 of the Exchange Act, to file with the SEC initial reports of ownership and reports of changes in ownership of Sunair's equity securities. Based upon Sunair's Proxy Statement filed January 28, 2009, to the knowledge of Sunair, Section 16(a) filing requirements were complied with by all of its directors, officers and greater than 10% beneficial owners.

**Delivery of the Information Statement to a Shared Address**

If you and one or more shareholders share the same address, it is possible that only one Information Statement was delivered to your address. Any registered shareholder who wishes to receive a separate copy of the Information Statement at the same address now or in the future may mail a request to receive separate copies to Sunair Services Corporation 595 South Federal Highway, Suite 500 Boca Raton, FL 33432 and Sunair will promptly deliver the Information Statement to you upon your request. Shareholders currently who received multiple copies of the Information Statement at a shared address and who wish to receive a single copy may direct their request to the same address.

8

Exhibit B: a true and correct copy of the Bylaws, as filed with the SEC by Sunair

{9725\00107689.1}

12

Exhibit 3.1

## AMENDED AND RESTATED
## BYLAWS
## OF
## SUNAIR SERVICES CORPORATION
## (A FLORIDA CORPORATION)

Adopted by the Board of Directors as of December 18, 2007

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

## TABLE OF CONTENTS

|  | Page |
|---|---|
| **ARTICLE ONE OFFICES** | 1 |
| Section 1. REGISTERED OFFICE | 1 |
| Section 2. OTHER OFFICES | 1 |
|  |  |
| **ARTICLE TWO MEETINGS OF SHAREHOLDERS** | 1 |
| Section 1. PLACE | 1 |
| Section 2. ANNUAL MEETING | 1 |
| Section 3. SPECIAL MEETINGS | 1 |
| Section 4. NOTICE OF WAIVER AND NOTICE | 1 |
| Section 5. PRECONDITION TO DELIVERY OF NOTICE OF SPECIAL MEETING OF SHAREHOLDERS |  |
|     CALLED BY SHAREHOLDERS | 2 |
| Section 6. ADVANCE NOTICE OF BUSINESS AT ANNUAL MEETING | 2 |
| Section 7. BUSINESS OF SPECIAL MEETING | 2 |
| Section 8. QUORUM | 2 |
| Section 9. REQUIRED VOTE | 2 |
| Section 10. VOTING OF SHARES | 2 |
| Section 11. PROXIES | 2 |
| Section 12. SHAREHOLDER LIST | 3 |
| Section 13. ACTION WITHOUT MEETING | 3 |
| Section 14. FIXING RECORD DATE | 3 |
| Section 15. INSPECTORS AND JUDGES | 3 |
|  |  |
| **ARTICLE THREE DIRECTORS** | 4 |
| Section 1. NUMBER, ELECTION AND TERM | 4 |
| Section 2. VACANCIES | 4 |
| Section 3. POWERS | 4 |
| Section 4. PLACE OF MEETINGS | 4 |
| Section 5. MEETING | 4 |
| Section 6. REGULAR MEETINGS | 4 |
| Section 7. SPECIAL MEETINGS AND NOTICE | 4 |
| Section 8. QUORUM AND REQUIRED VOTE | 5 |
| Section 9. ACTION WITHOUT MEETING | 5 |
| Section 10. TELEPHONE MEETINGS | 5 |
| Section 11. COMMITTEES | 5 |
| Section 12. COMPENSATION OF DIRECTORS | 5 |
| Section 13. CHAIRMAN OF THE BOARD | 5 |
| Section 14. SHAREHOLDER NOMINATION OF DIRECTOR CANDIDATES | 5 |
|  |  |
| **ARTICLE FOUR OFFICERS** | 6 |
| Section 1. POSITIONS | 6 |
| Section 2. ELECTION OF SPECIFIED OFFICERS BY BOARD | 6 |
| Section 3. ELECTION OR APPOINTMENT OF OTHER OFFICERS | 6 |
| Section 4. SALARIES | 6 |
| Section 5. TERM | 6 |
| Section 6. CHAIRMAN | 6 |
| Section 7. PRESIDENT | 6 |
| Section 8. CHIEF FINANCIAL OFFICER | 7 |
| Section 9. VICE PRESIDENTS | 7 |
| Section 10. SECRETARY | 7 |
| Section 11. TREASURER | 7 |
|  |  |
| **ARTICLE FIVE CERTIFICATES FOR SHARES** | 7 |
| Section 1. FORM OF SHARES | 7 |
| Section 2. LOST CERTIFICATES | 7 |
| Section 3. TRANSFER OF SHARES | 8 |
| Section 4. OTHER REGULATIONS | 8 |
| Section 5. LEGENDS FOR PREFERENCES AND RESTRICTIONS ON TRANSFER | 8 |
| Section 6. REGISTERED SHAREHOLDERS | 8 |

i

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

|  | Page |
|---|---|
| Section 7. REDEMPTION OF CONTROL SHARES | 8 |
|  |  |
| ARTICLE SIX GENERAL PROVISIONS | 9 |
| Section 1. DIVIDENDS | 9 |
| Section 2. RESERVES | 9 |
| Section 3. CHECKS | 9 |
| Section 4. FISCAL YEAR | 9 |
| Section 5. SEAL | 9 |
|  |  |
| ARTICLE SEVEN INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS | 9 |
| Section 1. DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS | 9 |
| Section 2. EXPENSES | 9 |
| Section 3. DETERMINATION OF STANDARD OF CONDUCT | 10 |
| Section 4. ADVANCE EXPENSES | 10 |
| Section 5. BENEFIT | 10 |
| Section 6. INSURANCE | 10 |
| Section 7. NO RIGHTS OF SUBROGATION | 10 |
| Section 8. INDEMNIFICATION FOR PAST DIRECTORS | 10 |
| Section 9. AFFILIATES | 10 |
| Section 10. FUND FOR PAYMENT OF EXPENSES | 10 |
| Section 11. AMENDMENTS | 10 |
|  |  |
| ARTICLE EIGHT AMENDMENTS OF BYLAWS | 11 |

ii

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

AMENDED AND RESTATED BYLAWS

OF

SUNAIR SERVICES CORPORATION

ARTICLE ONE

OFFICES

Section 1.REGISTERED OFFICE. The registered office of Sunair Services Corporation, a Florida corporation (the "Corporation"), shall be located in the State of Florida or such other location as determined by the Board of Directors of the Corporation (the "Board of Directors").

Section 2.OTHER OFFICES. The Corporation may also have offices at such other places, either within or without the State of Florida, as the Board of Directors may from time to time determine or as the business of the Corporation may require.

ARTICLE TWO

MEETINGS OF SHAREHOLDERS

Section 1.PLACE. All annual meetings of shareholders shall be held at such time and place, within or without the State of Florida, as may be designated by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof. Special meetings of shareholders may be held at such place, within or without the Sate of Florida, and at such time as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.ANNUAL MEETING. Annual meetings of shareholders shall be held on the date and at the time fixed, from time to time, by the Board of Directors, provided, that there shall be an annual meeting held every calendar year at such meeting. The shareholders shall elect a Board of Directors and transact such other business as may properly be brought before the meeting.

Section 3.SPECIAL MEETINGS. Special meetings of the shareholders may be called by the President, the Board of Directors or the holders of not less than ten percent of all shares entitled to vote at the meeting. Except as otherwise provided by law or in these Bylaws, upon request in writing delivered either in person or by registered or certified mail, return receipt requested, to the Chairman, President or Secretary by any persons entitled to call a special meeting, it shall be the duty of such Chairman, President or Secretary to cause to be given to the shareholders entitled thereto notice of such meeting to be held on a date not less than sixty (60) nor more than ninety (90) days after the receipt of such request, as such officer may fix.

Section 4.NOTICE OF WAIVER AND NOTICE. Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the day of the meeting, either personally or by first-class mail, by or at the direction of the President, the Secretary, or the officer or person calling the meeting, to each shareholder of record entitled to vote at such meeting. A notice mailed at least thirty (30) days before the date of the meeting, may be done by a class of United States mail other than first-class. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the shareholder at his address as it appears on the stock transfer books of the Corporation, with postage thereon prepaid. If a meeting is adjourned to another time and/or place, and if an announcement of the adjourned time and/or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting unless the Board of Directors, after adjournment, fixes a new record date for the adjourned meeting. Notice need not be given to any shareholder who submits a written waiver of notice by him before or after the time stated therein. Attendance of a person at a

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

meeting of shareholders shall constitute a waiver of notice of such meeting, except when a shareholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the shareholders need be specified in any written waiver of notice.

Section 5.PRECONDITION TO DELIVERY OF NOTICE OF SPECIAL MEETING OF SHAREHOLDERS CALLED BY SHAREHOLDERS. The secretary shall inform shareholders who have delivered a written request for a special meeting and otherwise complied with Section 3 of the reasonably estimated costs of preparing and mailing a notice of the meeting, and, on payment of these costs to the Corporation, the secretary shall deliver notice of such meeting to each shareholder entitled thereto.

Section 6.ADVANCE NOTICE OF BUSINESS AT ANNUAL MEETING. Except as otherwise provided in these Bylaws, any shareholder entitled to vote at a meeting may propose business to be brought before such a meeting only if such meeting is an annual meeting of shareholders and if written notice of the shareholder's intent to bring such business before the meeting has been given, either by personal delivery or by the United States Mail, postage prepaid, to the Secretary of the Corporation, not later than ninety (90) days prior to the date one year from the date of the immediately preceding annual meeting of shareholders. Each such notice shall set forth: (a) the name and address of the shareholder who intends to bring such business before the meeting; (b) a representation that the shareholder is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to bring such business specified in the notice; (c) a description of all arrangements or understandings between the shareholder and any party to which such business relates; and (d) such other information regarding the business proposed by such shareholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission, had the business been proposed by the Board of Directors. The presiding officer at the meeting may refuse to acknowledge and business not made in compliance with the foregoing procedure.

Section 7.BUSINESS OF SPECIAL MEETING. Business transacted at any special meeting shall be confined to the purposes stated in the notice thereof.

Section 8.QUORUM. The holders of a majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at meetings of shareholders except as otherwise provided in the Corporation's articles of incorporation (the "Articles of Incorporation"). If, however, a quorum shall not be present or represented at any meeting of the shareholders, the shareholders present in person or represented by proxy shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally notified and called. The shareholders present at a duly organized meeting may continue to transact business notwithstanding the withdrawal of some shareholders prior to adjournment, but in no event shall a quorum consist of the holders of less than one-third (1/3) of the shares entitled to vote and thus represented at such meeting.

Section 9.REQUIRED VOTE. The vote of the holders of a majority of the shares entitled to vote and represented at a meeting at which a quorum is present shall be the act of the Corporation's shareholders, unless the vote of a greater number is required by law, the Articles of Incorporation or these Bylaws.

Section 10.VOTING OF SHARES. Each outstanding share, regardless of class, shall be entitled to vote on each matter submitted to a vote at a meeting of shareholders, except to the extent that the voting rights of the shares of any class are limited or denied by the Articles of Incorporation or the Florida Business Corporation Act. Treasury shares, shares of this Corporation's stock which is owned by this Corporation, and the shares of this Corporation's stock held by another corporation in a fiduciary capacity for the benefit of this Corporation shall not be voted, directly or indirectly, at any meeting of shareholders.

Section 11.PROXIES. A shareholder may vote in person or by proxy executed in writing by the shareholder or by his duly authorized attorney-in-fact. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. Each proxy shall be revocable unless expressly provided therein to be irrevocable, and unless otherwise made irrevocable by law.

2

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

Section 12.SHAREHOLDER LIST. The officer or agent having charge of the Corporation's stock transfer books shall make, at least ten (10) days before each meeting of shareholders, a complete list of the shareholders entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of, and the number and class and series, if any, of shares held by each. Such list, for a period of ten (10) days prior to such meeting, shall be subject to inspection by any shareholder at any time during the usual business hours at the place where the meeting is to be held. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any shareholder during the whole time of the meeting. The original stock transfer books shall be prima facie evidence as to who are the shareholders entitled to examine such list or transfer book or to vote at any such meeting of shareholders.

Section 13.ACTION WITHOUT MEETING. Unless otherwise provided by law or in the Articles of Incorporation, any action required by statute to be taken at an annual or special meeting of shareholder's, or any action that may be taken at a meeting of the shareholders, may be taken without a meeting, without prior notice and without a vote if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock entitled to vote on the action having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voting with respect to the subject matter thereon and such consent shall have the same force and effect as a vote of shareholders taken at such a meeting. In order to be effective the action must be evidenced by one or more written consents describing the action taken, dated and signed by approving shareholders having the requisite number of votes of each voting group entitled to vote thereon, and delivered to the Corporation by delivery to its principal office in this state, its principal place of business, the corporate secretary, or another officer or agent of the Corporation having custody of the book in which proceedings of meetings of shareholders are recorded. No written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the date of the earliest dated consent delivered in the manner required by this section, written consents signed by the number of holders required to take action are delivered to the Corporation by delivery as set forth in this section. Within 10 days after obtaining such authorization by written consent, notice must be given to those shareholders who have not consented in writing or who are not entitled to vote on the action. The notice shall fairly summarize the material features of the authorized action and, if the action be such for which dissenters' rights are provided under this act, the notice shall contain a clear statement of the right of shareholders dissenting therefrom to be paid the fair value of their shares upon compliance with further provisions of this act regarding the rights of dissenting shareholders.

Section 14.FIXING RECORD DATE. For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, or entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purposes, the Board of Directors may fix in advance a date as the record date for any such determination of shareholders, such date in any case to be not more than seventy (70) days, and, in case of a meeting of shareholders, not less than ten (10) days, prior to the date on which the particular action requiring such determination of shareholders is to be taken. If no record date is fixed for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, or shareholders entitled to receive payment of a dividend, the date on which the notice of the meeting is mailed or the date on which the resolutions of the Board of Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders. When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this Section, such determination shall apply to any adjournment thereof, except where the Board of Directors fixes a new record date.

Section 15.INSPECTORS AND JUDGES. The Board of Directors in advance of any meeting may, but need not, appoint one or more inspectors of election of judges of the vote, as the case may be, to act at the meeting or any adjournment thereof. If any inspector or inspectors, or judge or judges, are not appointed, the person presiding at the meeting may, but need not, appoint one or more inspectors or judges. In case any person who may be appointed as an inspector or judge fails to appear or act, the vacancy may be filled by appointment made by the directors in advance of the meeting, or at the meeting by the person presiding thereat. The inspectors or judges, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots and consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate votes, ballots and consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all shareholders. On request of the person presiding at the meeting, the inspector or

3

inspectors or judge or judges, if any, shall make a report in writing of any challenge, question or matter determined by him or them, and execute a certificate of any fact found by him or them.

### ARTICLE THREE

### DIRECTORS

Section 1. NUMBER, ELECTION AND TERM. The number of directors of the Corporation shall be fixed from time to time, within the limits specified by the Articles of Incorporation, by resolution of the Board of Directors; provided, however, no director's terms shall be shortened by reason of a resolution reducing the number of directors. The directors shall be elected at the annual meeting of the shareholders, except as provided in Section 2 of this Article, and each director elected shall hold office for the term for which he is elected and until his successor is elected and qualified. Directors need not be residents of the State of Florida, shareholders of the Corporation or citizens of the United States. A director or the entire Board of Directors may be removed at any time and only by the affirmative vote of the holders of at least a majority of the shares entitled to vote and represented at a special meeting of the shareholders called for that purpose at which a quorum is present.

Section 2. VACANCIES. A director may resign at any time by giving written notice to the Board of Directors or the Chairman of the Board. Such resignation shall take effect at the date of receipt of such notice or at any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any vacancy occurring in the Board of Directors and any directorship to be filled by reason of an increase in the size of the Board of Directors shall be filled by the affirmative vote of a majority of the current directors though less than a quorum of the Board of Directors. A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office, or until the next election of one or more directors by shareholders if the vacancy is caused by an increase in the number of directors. A director elected to fill a position resulting from an increase in the Board of Directors shall be apportioned among the classes as equally as possible.

Section 3. POWERS. The business and affairs of the Corporation shall be managed by its Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Articles of Incorporation or by these Bylaws directed or required to be exercised and done by the shareholders.

Section 4. PLACE OF MEETINGS. Meetings of the Board of Directors, regular or special, may be held either within or without the State of Florida.

Section 5. MEETING. The first meeting of each newly elected Board of Directors shall be held, without call or notice, immediately following each annual meeting of shareholders.

Section 6. REGULAR MEETINGS. Regular meetings of the Board of Directors may also be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

Section 7. SPECIAL MEETINGS AND NOTICE. Special meetings of the Board of Directors may be called by the Chairman or President and shall be called by the Secretary on the written request of two (2) directors. Written notice of special meetings of the Board of Directors shall be given to each director at least twenty-four (24) hours before the meeting. Except as required by statute, neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting. Notices to directors shall be in writing and delivered personally, by telecopier, delivery to an overnight courier service or mailed by first class or registered mail to the directors at their addresses appearing on the books of the Corporation. Notice by mail shall be deemed to be given at the time when the same shall be received. Notice to directors may also be given by telegram, and shall be deemed delivered when the same shall be deposited at a telegraph office for transmission and all appropriate fees therefor have been paid. Whenever any notice is required to be given to any director, a waiver therefor in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice. Attendance of a director at a meeting shall constitute a waiver of notice of such meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

4

Section 8.QUORUM AND REQUIRED VOTE. A majority of the directors shall constitute a quorum for the transaction of business and the act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless a greater number is required by the Articles of Incorporation. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present. At such adjourned meeting at which a quorum shall be present, any business may be transacted that might have been transacted at the meeting as originally notified and called.

Section 9.ACTION WITHOUT MEETING. Any action required or permitted to be taken at a meeting of the Board of Directors or committee thereof may be taken without a meeting if a consent in writing, setting forth the action taken, is signed by all of the members of the Board of Directors or the committee, as the case may be, and such consent shall have the same force and effect as a unanimous vote at a meeting.

Section 10.TELEPHONE MEETINGS. Directors and committee members may participate in and hold a meeting by means of conference telephone or similar communication equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground the meeting is not lawfully called or convened.

Section 11.COMMITTEES. The Board of Directors, by resolution adopted by a majority of the whole Board of Directors, may designate from among its members an executive committee and one or more other committees, each of which, to the extent provided in such resolution, shall have and may exercise all of the authority of the Board of Directors in the business and affairs of the Corporation except where the action of the full Board of Directors is required by statute. Vacancies in the membership of a committee shall be filled by the Board of Directors at a regular or special meeting of the Board of Directors. The executive committee and all other committees shall keep regular minutes of its proceedings and report the same to the Board of Directors when required. A majority of the directors designated to a committee, shall be present at each meeting to constitute a quorum for the transaction of business, and the acts of the majority of the directors designated to a committee shall be the acts of the committee. The designation of any such committee and all other committees and the delegation thereto of authority shall not operate to relieve the Board of Directors, or any member thereof, of any responsibility imposed upon it or him by law.

Section 12.COMPENSATION OF DIRECTORS. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings. Amounts paid to Directors shall be set by the Board of Directors.

Section 13.CHAIRMAN OF THE BOARD. The Board of Directors may, in its discretion, choose a Chairman of the Board who shall preside at meetings of the shareholders and of the directors and shall be an ex officio member of all standing committees. The Chairman of the Board shall have such other powers and shall perform such other duties as shall be designated by the Board of Directors. The Chairman of the Board shall be a member of the Board of Directors but no other officers of the Corporation need be a director. The Chairman of the Board shall serve until his successor is chosen and qualified, but he may be removed at any time by the affirmative vote of a majority of the Board of Directors.

Section 14.SHAREHOLDER NOMINATION OF DIRECTOR CANDIDATES. Except as otherwise provided by law or in the Articles of Incorporation, nominations for the election of directors may be made by the Board of Directors or by a committee appointed by the Board of Directors or by any shareholder entitled to vote in the election of directors generally. Any shareholder entitled to vote in the election of directors generally may nominate one or more persons for election as directors at a meeting only if written notice of such shareholder's intent to make such nomination or nominations has been given, either by personal delivery or by the United States mail, postage prepaid, to the Secretary of the Corporation, not later than (i) with respect to an election to be held at an annual meeting of

5

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

shareholders, ninety (90) days prior to the date one year from the date of the immediately preceding annual meeting of shareholders and (ii) with respect to an election to be held at a special meeting of shareholders for the election of directors, within ten (10) days after the date on which notice of such meeting is first given to shareholders. Each such notice shall set forth: (a) the names and addresses of the shareholder who intends to make the nomination and of the person or persons to be nominated; (b) a representation that the shareholder is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice; (c) a description of all arrangements or understandings between the shareholder and each nominee and any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the shareholders; (d) such other information regarding each nominee proposed by such shareholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission, had the nominee been nominated, or intended to be nominated by the Board of Directors; and (e) the consent of each nominee to serve as a director of the Corporation if elected. The presiding officer at the meeting may refuse to acknowledge the nomination of any person not made in compliance with the foregoing procedure.

## ARTICLE FOUR

### OFFICERS

Section 1.POSITIONS. The officers of the Corporation shall consist of a President, one or more Vice Presidents, a Secretary and a Treasurer, and, if elected by the Board of Directors by resolution, a Chairman of the Board. Any two or more offices may be held by the same person.

Section 2.ELECTION OF SPECIFIED OFFICERS BY BOARD. The Board of Directors at its first meeting after each annual meeting of shareholders shall elect a President, one or more Vice Presidents, a Secretary and a Treasurer of the Corporation.

Section 3.ELECTION OR APPOINTMENT OF OTHER OFFICERS. Such other officers and assistant officers and agents as may be deemed necessary may be elected or appointed by the Board of Directors, or, unless otherwise specified herein, appointed by the President of the Corporation. The Board of Directors shall be advised of appointments by the President at or before the next scheduled Board of Directors meeting.

Section 4.SALARIES. The salaries of all officers of the Corporation to be elected by the Board of Directors pursuant to Article Four, Section 2 hereof shall be fixed from time to time by the Board of Directors or pursuant to its discretion. The salaries of all other elected or appointed officers of the Corporation shall be fixed from time to time by the President of the Corporation or pursuant to his discretion.

Section 5.TERM. The officers of the Corporation shall hold office until their successors are chosen and qualified. Any officer or agent elected or appointed by the Board of Directors or the President of the Corporation may be removed, with or without cause, by the Board of Directors whenever in its judgment the best interests of the Corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Any officers or agents appointed by the President of the Corporation pursuant to Section 3 of this Article Four may also be removed from such officer positions by the President, with or without cause. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise shall be filled by the Board of Directors, or, in the case of an officer appointed by the President of the Corporation, by the President or the Board of Directors.

Section 6.CHAIRMAN. The Chairman of the Board shall preside as Chairman of all meetings of the shareholders and of the Board of Directors. The Chairman may execute contracts, instruments and documents in the name of the Corporation, and appoint and discharge agents and employees. The Chairman of the Board shall have duties as may be prescribed by the Board of Directors from time to time.

Section 7.PRESIDENT. The President shall be the Chief Executive Officer of the Corporation, shall have the responsibility for supervising the day-to-day management and affairs of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect. In the absence of the Chairman of the Board or in the event the Board of Directors shall not have designated a Chairman of the Board, the President shall preside at meetings of the shareholders and the Board of Directors.

6

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

Section 8.CHIEF FINANCIAL OFFICER. The Chief Financial Officer shall be the principal financial officer of the Corporation and, unless another officer is so designated, principal accounting officer of the Corporation; whenever required by the Board of Directors, he shall render a statement of the financial condition of the Corporation; shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Corporation, including, but not limited to, accounts of its assets, liabilities, receipts disbursement, gains, losses, capital surplus and shares; shall be responsible for assuming adherence to such financial polices as are promulgated by the Board of Directors; and, in general, shall discharge such other duties as may from time to time be assigned to him by the Board of Directors, the Chairman of the Board or the president. The books of account shall be open at all reasonable times to inspection by any director.

Section 9.VICE PRESIDENTS. Each Vice President shall possess, and may exercise, such power and authority, and shall perform such duties, as may from time to time be assigned to him by the Board of Directors, the Chief Executive Officer or the President. In the event of the incapacity of the President, a Vice President designated by the Board of Directors shall perform such duties of the President as the Board of Directors shall prescribe. A Vice President may execute contracts in the name of the Corporation as authorized by the Board of Directors.

Section 10.SECRETARY. The Secretary shall attend all meetings of the Board of Directors and all meetings of the shareholders and record all the proceedings of the meetings of the shareholders and of the Board of Directors in a book to be kept for the purpose and shall perform like duties for the standing committees when required. He shall give, or cause to be given, notice of all meetings of the shareholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or President, under whose supervision he shall be. He shall keep in safe custody the seal of the Corporation and, when authorized by the Board of Directors, affix the same to any instrument requiring it.

Section 11.TREASURER. The Treasurer shall have the custody of corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. He shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors at its regular meetings or when the Board of Directors so requires an account of all his transactions as treasurer and of the financial condition of the Corporation.

## ARTICLE FIVE

### CERTIFICATES FOR SHARES

Section 1.FORM OF SHARES. Shares of the Corporation shall be in such form, certificated or uncertificated, consistent with law, as shall be determined by the Board of Directors. If the shares are represented by certificates, such shares shall be represented by certificates signed, either manually or by facsimile, in the name of the Corporation by the chief executive officer or the president and by the secretary or by one or more other persons designated by the Board of Directors. In case any officer who has signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such officer before such certificate is issued, such certificate may nonetheless be issued by the Corporation with the same effect as if he were such officer at the date of its issue. Certificates of stock shall be in such form and shall contain such information consistent with law as shall be prescribed by the Board of Directors. If shares are not represented by certificates, within a reasonable time following the issue or transfer of such shares, the Corporation shall send the shareholder a complete written statement of all of the information required to be provided to holders of uncertificated shares by the Florida Business Corporation Act and any other applicable law. Except as otherwise provided by law, the rights and obligations of holders of uncertificated shares and the rights and obligations of the holders of certificated shares of the same class and series shall be identical. Certificated or uncertificated shares shall not be issued until the shares represented thereby are fully paid.

Section 2.LOST CERTIFICATES. In case of the alleged loss, destruction or mutilation of a certificate of stock, the Board of Directors may direct the issuance of a new certificate or may register uncertificated shares in lieu thereof upon such terms and conditions in conformity with law as the Board of Directors may prescribe. The Board

7

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

of Directors may in its discretion require an affidavit of lost certificate and/or a bond in such form and amount and with such surety as it may determine before issuing a new certificate or registering uncertificated shares.

Section 3. TRANSFER OF SHARES. Transfer of shares shall be made only on the books of the Corporation by the registered holder thereof, or by such holder's attorney thereunto authorized by power of attorney and filed with the Secretary of the Corporation or a transfer agent of the Corporation. If such shares are certificated, upon surrender to the Corporation or to a transfer agent of the Corporation of a certificate of stock duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, and receipt of such documentary stamps as may be required by law and evidence of compliance with all applicable securities laws and other restrictions, the Corporation shall issue a new certificate or register uncertificated shares to the person entitled thereto, and cancel the old certificate. Upon the receipt of proper transfer instructions of uncertificated shares by the holders thereof in person or by their duly authorized attorney, such uncertificated shares shall be cancelled and the Corporation shall issue new equivalent certificated shares or register uncertificated shares to the person entitled thereto.

Section 4. OTHER REGULATIONS. The issue, transfer, conversion and registration of stock certificates shall be governed by such other regulations as the Board of Directors may establish.

Section 5. LEGENDS FOR PREFERENCES AND RESTRICTIONS ON TRANSFER. Every certificate representing shares issued by the Corporation shall set forth or fairly summarize upon the face or back of the certificate, or shall state that the Corporation will furnish to any shareholder upon request and without charge a full statement of:

(a) The designation, preferences, limitation, and relative rights of the shares of each class or series authorized to be issued.

(b) The variations in the relative rights and preferences between the shares of each such series, if the Corporation is authorized to issue any preferred or special class in series and so far as the same have been fixed and determined.

(c) The authority of the Board of Directors to fix and determine the relative rights and preferences of subsequent series.

Every certificate representing shares that are restricted as to the sale, disposition, or transfer of such shares shall also indicate that such shares are restricted as to transfer and there shall be set forth or fairly summarized upon the certificate, or the certificate shall indicate that the Corporation will furnish to any shareholder upon request and without charge, a full statement of such restrictions. If the Corporation issues any shares that are not registered under the Securities Act of 1933, as amended, and registered or qualified under the applicable state securities laws, the transfer of any such shares shall be restricted substantially in accordance with the following legend.

"THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY APPLICABLE STATE LAW. THEY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR PLEDGED WITHOUT (1) REGISTRATION

Section 6. REGISTERED SHAREHOLDERS. The Corporation shall be entitled to recognize the exclusive rights of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Florida.

Section 7. REDEMPTION OF CONTROL SHARES. As provided by the Florida Business Corporation Act, if a person acquiring control shares of the Corporation does not file an acquiring person statement with the Corporation, the Corporation may redeem the control shares at fair market value at any time during the sixty (60) day period after the last acquisition of such control shares. If a person acquiring control shares of the Corporation

8

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

files an acquiring person statement with the Corporation, the control shares may be redeemed by the Corporation only if such shares are not accorded full voting rights by the shareholders as provided by law.

## ARTICLE SIX

### GENERAL PROVISIONS

Section 1.DIVIDENDS. The Board of Directors may from time to time declare, and the Corporation may pay, dividends on its outstanding shares in cash, property, or its own shares pursuant to law and subject to the provisions of the Articles of Incorporation.

Section 2.RESERVES. The Board of Directors may by resolution create a reserve or reserves out of earned surplus for any proper purpose or purposes, and may abolish any such reserve in the same manner.

Section 3.CHECKS. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 4.FISCAL YEAR. The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors.

Section 5.SEAL. The corporate seal shall have inscribed thereon the name and state of incorporation of the Corporation. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

## ARTICLE SEVEN

### INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS

Section 1.DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS. The Corporation shall indemnify any officer or director who was or is a party or is threatened to be made a party (which shall include the giving of testimony or similar involvement) to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding, including any appeal thereof, if he acted in good faith in a manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and with respect to any criminal action or proceedings, had no reasonable cause to believe that his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not create, of itself, a presumption that the person did not act in good faith or in a manner which he reasonably believed to be in, or not opposed to, the best interests of the Corporation or, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful. No indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable unless, and only to the extent that, the court in which such proceeding was brought, or any other court of competent jurisdiction, shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

The Corporation may, by action of the Board of Directors and to the extent provided in such action, indemnify employees and agents as though they were officers and directors.

Section 2.EXPENSES. In accordance with Section 1 above, the Corporation shall indemnify any officer or director against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

9

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

Section 3.DETERMINATION OF STANDARD OF CONDUCT. Any indemnification hereunder, unless pursuant to a determination by a court, shall be made by the Corporation as authorized upon a determination that indemnification of the director or officer is proper in the circumstances because such person has met the applicable standard of conduct set forth above. Such determination shall be made either (1) by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such proceeding, (2) by majority vote of a committee duly designated by the Board of Directors consisting of two or more directors not at the time parties to the proceeding, (3) by the shareholders who were not parties to such action, suit or proceedings, or (4) by independent legal counsel selected in accordance with the provisions of the Florida Business Corporation Act in a written opinion.

Section 4.ADVANCE EXPENSES. To the extent permitted by applicable law, expenses (including attorney's fees) incurred by an officer or director of the Corporation in defending any action, suit or proceeding shall be paid, by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer, to repay such amount of it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized herein.

Section 5.BENEFIT. The indemnification provided by this Article shall be in addition to the indemnification rights provided pursuant to the Florida Business Corporation Act, and shall not be deemed exclusive of any other rights to which person seeking indemnification may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors or otherwise, both as to any action in such person's official capacity and as to action in another capacity while holding such office (provided that no indemnification may be made if expressly prohibited by the Florida Business Corporation Act), and shall continue as to a person who has ceased to be a director or officer of the Corporation and shall inure to the benefit of the heirs, executors and administrators of such a person.

Section 6.INSURANCE. The Corporation shall be empowered to purchase and maintain insurance on behalf of any person who is or was a director or officer, of the Corporation or is or was serving at the request of the Corporation as a director or officer, of another Corporation, partnership, joint venture, trust or other enterprise against liability asserted against him and incurred by him in any such capacity or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions contained herein.

Section 7.NO RIGHTS OF SUBROGATION. Indemnification herein shall be a personal right, and the Corporation shall have no liability under this Article to any insurer or any person, Corporation, partnership, association, trust or other entity (other than the heirs, executors or administrators of any person otherwise entitled to indemnification pursuant to the provisions of this Article) by reason of subrogation, assignment or succession by any other means to the claim of any person to indemnification hereunder.

Section 8.INDEMNIFICATION FOR PAST DIRECTORS. Indemnification as provided in this Article shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of the heirs, executors, and administrators of such a person.

Section 9.AFFILIATES. For the purposes of this Article, references to "the Corporation" include any constituent corporations absorbed in a consolidation or merger, as well as the resulting or surviving corporation, so that any person who is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise shall stand in the same position under the provisions of this Article with respect to the resulting or surviving corporation as he would if he had served the resulting or surviving corporation in the same capacity.

Section 10.FUND FOR PAYMENT OF EXPENSES. The Corporation may create a fund of any nature, which may, but need to be, under the control of a trustee, or otherwise may secure in any manner its indemnification obligations, whether arising hereunder, under the Articles of Incorporation, by agreement, vote of shareholders or directors, or otherwise.

Section 11.AMENDMENTS. The provisions of this Article Seven relating to indemnification and to the advancement of expenses shall constitute a contract between the Corporation and each of its directors and officers

10

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

which may be modified as to any director or officer only with that person's consent or as specifically provided in this Article. Notwithstanding any other provision of these Bylaws relating to their amendment generally, any repeal or amendment of this Article which is adverse to any director or officer shall apply to such director or officer only on a prospective basis, and shall not limit the rights of a director or officer to indemnification or to the advancement of expenses with respect to any action or failure to act occurring prior to the time of such repeal or amendment.

## ARTICLE EIGHT

### AMENDMENTS OF BYLAWS

These Bylaws may be amended, altered or added to by the vote of the Board of Directors of the Corporation at any regular meeting of said Board, or at a special meeting of the Board of Directors called for that purpose, provided a quorum of the Directors is present at such regular or special meeting. These Bylaws and any amendments thereto and new Bylaws added by the Board of Directors may be amended, altered or replaced by the shareholders at any annual or special meeting of the shareholders. Bylaws amended by the shareholders, if they shall so state, cannot subsequently be amended by the Board of Directors. This Article Eight cannot be amended by the Board of Directors. Whenever any provision in these Bylaws or any amendment thereto shall conflict with a provision in the Articles of Incorporation (and any amendment thereto then in effect), the applicable provisions in such certificate (so amended) shall prevail and control.

11

Created by 10K Wizard    www.10KWizard.com

Source: SUNAIR SERVICES CORP, 8-K, December 20, 2007

Exhibit C: a true and correct copy of the Proxy example filed by Sunair with the SEC

{9725\00107689.1}

13

**PROXY**
**AND POWER OF ATTORNEY**

By its execution hereof, the undersigned limited partner (the "**Limited Partner**") of Coconut Palm Capital Investors II, Ltd., a Florida limited partnership (the "**Partnership**") hereby constitutes and appoints Coconut Palm Capital Investors II, Inc., and any of its nominees designated in writing (the "**Proxy Holder**"), with full power of substitution and resubstitution, as such Limited Partner's true and lawful attorney and proxy, for and in such Limited Partner's name, place and stead, to vote each and all of the securities of Sunair Services Corporation, a Florida corporation ("**Sunair**"), owned by the Limited Partner, as set forth on **Exhibit A** hereto (the "**Securities**"), at every meeting of the shareholders of Sunair, and to execute on behalf of such Limited Partner, or to instruct the record holder to execute, any ballot, proxy, consent, certificate or other document relating to the Proxy Holder that law permits or requires with respect to any matters involving or related to Sunair, in such Proxy Holder's sole discretion.

This Proxy and Power of Attorney ("**Proxy**"), effective as the date hereof, is granted in connection with the redemption of the Limited Partner's partnership interests in the Partnership, is coupled with an interest, and shall be irrevocable to the extent permitted by law until the Expiration Date (as defined below).

The Limited Partner hereby grants and gives the Proxy Holder full authority and power to do and perform any and all other acts necessary or incident to the performance and execution of the power the Limited Partner has expressly granted, with power to do and perform all acts authorized hereby, as fully to all intents and purposes as the Limited Partner might or could do if personally present.

The Limited Partner hereby ratifies and confirms all acts whatsoever that the Proxy Holder, as the Limited Partner's agent, shall or may do by virtue of this Proxy.

In addition, the Limited Partner shall perform such further acts and execute such further documents and instruments as may reasonably be required to vest in Proxy Holder, or its nominees, the power to carry out and give effect to the provisions of this Proxy.

Notwithstanding anything to the contrary contained herein, this Proxy shall automatically terminate (the "**Expiration Date**") as of the earlier to occur of the following: (i) upon the execution of a written agreement by the Limited Partner, Partnership and Proxy Holder; or (ii) such date and time as the Limited Partner shall Transfer (as defined below) the Securities to any third party, or any ownership interest in the Securities to any third party; provided, however, if the Limited Partner Transfers some, but not all, of the Securities, then this Proxy shall terminate solely with respect to the Transferred Securities and shall remain valid and enforceable with respect to any remaining Securities owned by the Limited Partner.

For purposes of this Proxy, the Limited Partner shall be deemed to have effected a "**Transfer**" of a Security if such Limited Partner, directly or indirectly: (i) sells, offers to sell, enters into any type of equity swap, transfers or disposes of such Security, any interest therein, or the economic consequences of ownership of such Security or (ii) enters into an agreement, contract or commitment providing for the foregoing; provided, however, the Limited Partner shall not deposit (or permit the deposit of) any Securities in a voting trust or grant any proxy, or enter into any voting agreement or similar agreement or arrangement in contravention of the obligations of the Limited Partner under this Proxy. For purposes of this Proxy, a Transfer shall not include any Transfer of Securities: (i) to any member of the Limited Partner's immediate family; (ii) to any entity controlled by the Limited Partner or any member of the Limited Partner's immediate family; (iii) to a trust for the benefit of the Limited Partner or any member of the Limited Partner's immediate family; or (iv) upon the death of the Limited Partner (each a "**Related Party Transfer**"). In the event the Limited Partner intends to effectuate any Related Party Transfer, the intended transferee of the Securities shall duly execute a counterpart of this Proxy, and shall agree in writing to hold such Securities, or such interest therein, subject to all of the terms and conditions set forth in this Proxy. The Limited Partner hereby represents and agrees to those persons dealing with the Proxy Holder that this Proxy will not terminate upon the Limited Partner's death, disability or incompetence.

1

The Limited Partner hereby agrees to provide written notice of any Transfer of Securities to the Partnership and the Proxy Holder within five (5) business days following such Transfer. Until such time as the Partnership and the Proxy Holder have received such notice, the Partnership and the Proxy Holder shall be entitled to rely on this Proxy.

This Proxy shall be governed by, construed and enforced in accordance with the laws of the State of Florida.

       **IN WITNESS WHEREOF**, the undersigned has executed this Proxy and Power of Attorney, effective as of the date first set forth above.

 

                                _____

                                Signature

                                _____

                                Name (Please Print Name Exactly as it Appears on the Partnerships' Records)

                                _____

                                Title (Applicable Only for Entities)

STATE OF _____)
                      ) SS:
COUNTY OF _____)

The foregoing instrument was acknowledged before me on this _____ day of _____, 200__, by_____, individually, or in his, her or its capacity as the _____ [Insert Title] of _____ [Insert Name of Class A Limited Partner], who is personally known to me or who has produced _____ (type of identification) as identification.

Printed Name: _____

Notary Public: _____

Commission Expires: _____

Serial Number: _____

2

Exhibit D: a true and correct copy of the relevant written materials that Sunair filed with the SEC

{97250010768 9.1}

14

DEF 14A

DEF 14A 1 g17405def14a.htm DEF 14A

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A
### (RULE 14a-101)

## INFORMATION REQUIRED IN PROXY STATEMENT
## SCHEDULE 14A INFORMATION

### PROXY STATEMENT PURSUANT TO SECTION 14(A) OF THE SECURITIES
### EXCHANGE ACT OF 1934

Filed by the registrant ☑

Filed by a party other than the registrant ☐

Check the appropriate box:

☐ Preliminary proxy statement
☐ Confidential, for Use of the Commission only (as permitted by Rule 14a-6(e)(2))
☑ Definitive proxy statement
☐ Definitive additional materials
☐ Soliciting material pursuant to Rule 14a-11(c) or Rule 14a-12

## SUNAIR SERVICES CORPORATION
### (Name of Registrant as Specified in Its Charter)

Payment of filing fee (Check the appropriate box):

☑ No fee required.

☐ Fee computed on the table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1) Title of each class of securities to which transaction applies:

   (2) Aggregate number of securities to which transaction applies:

   (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11:

   (4) Proposed maximum aggregate value of transaction:

   (5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

   (1) Amount previously paid:

   (2) Form, schedule or registration statement no.:

   (3) Filing party:

   (4) Date Filed:

DEF 14A

# SUNAIR SERVICES CORPORATION
### 595 SOUTH FEDERAL HIGHWAY, SUITE 500
### BOCA RATON, FLORIDA 33432

## NOTICE OF ANNUAL MEETING OF SHAREHOLDERS
### TO BE HELD ON MARCH 18, 2009

To our shareholders:

The Annual Meeting of Shareholders ("Annual Meeting") of Sunair Services Corporation ("Company") will be held on March 18, 2009, at 11:00 a.m., local time, at the Hilton Hotel, 100 Fairway Drive, Deerfield Beach, Florida, 33441 for the following purposes:

(1) To elect seven members to our Board of Directors who are named on pages 4-5 of this proxy statement, each to serve until the next Annual Meeting of Shareholders or until their successors have been duly elected and qualified; and

(2) To act upon such other business as may properly come before the Annual Meeting and any and all adjournments or postponements thereof.

All shareholders of record at the close of business on January 28, 2009 will be entitled to vote at the Annual Meeting or any adjournments or postponements thereof.

By Order of the Board of Directors

/s/ JACK I. RUFF
Jack I. Ruff
President and Chief Executive Officer

Boca Raton, FL
January 28, 2009

*This is an important meeting and you are invited to attend the Annual Meeting in person. Whether or not you expect to be present at the Annual Meeting, please complete, sign and date the enclosed proxy card and return it promptly in the enclosed return envelope. No postage is required if mailed in the United States. Shareholders who execute a proxy card may nevertheless attend the Annual Meeting, revoke their proxy and vote their shares in person.*

## SUNAIR SERVICES CORPORATION
### 595 SOUTH FEDERAL HIGHWAY, SUITE 500
### BOCA RATON, FLORIDA 33432

## PROXY STATEMENT
## ANNUAL MEETING OF SHAREHOLDERS

This proxy statement is furnished in connection with the solicitation by the Board of Directors of Sunair Services Corporation ("Company," "us," "our" or "we"), of proxies to be used with respect to the matters to be voted upon at the Annual Meeting of Shareholders ("Annual Meeting") to be held on March 18, 2009, at 11:00 a.m., local time, at the Hilton Hotel, 100 Fairway Drive, Deerfield Beach, Florida, 33441, and at any adjournments or postponements thereof.

The approximate date that this proxy statement and the enclosed form of proxy are first being sent to shareholders is February 2, 2009. You should review the information provided in this proxy statement together with our Annual Report on Form 10-K for the fiscal year ended September 30, 2008, which is being delivered to shareholders simultaneously with this proxy statement.

### ABOUT THE MEETING

*What is the purpose of the Annual Meeting?*

At the Annual Meeting, shareholders will vote on the election of seven members to our Board of Directors, who are named on pages 4-5 of this proxy statement. In addition, we will report on our performance and respond to questions from our shareholders.

*Who is entitled to vote at the meeting?*

If you are the record holder of shares of our common stock at the close of business on January 28, 2009 (the "Record Date"), you are entitled to vote at the Annual Meeting. With respect to all matters to be acted upon at the Annual Meeting, each share of our common stock is entitled to one vote.

*Who can attend the meeting?*

Only holders of our stock as of January 28, 2009 (the "Record Date") or their duly appointed proxies, may attend. If your shares are held in the name of your broker or bank, you will need to bring evidence of your stock ownership, such as your most recent brokerage statement, and valid picture identification.

*What constitutes a quorum?*

The presence, in person or by proxy, of the holders of shares representing a majority of the outstanding shares of our common stock will constitute a quorum, permitting the meeting to conduct its business. As of the Record Date, we had issued and outstanding 13,091,088 shares of common stock. Proxies received, but marked as abstentions, and broker non-votes will be included in the calculation of the number of shares considered to be present at the meeting, but will not be counted as votes cast "for" or "against" any given matter.

If less than a majority of outstanding shares entitled to vote are represented at the meeting, a majority of the shares present at the meeting may adjourn the meeting to another date, time or place, and notice need not be given of the new date, time or place if the new date, time or place is announced at the meeting before an adjournment is taken.

*How do I vote?*

If you complete and properly sign the accompanying proxy card and return it to us, it will be voted as you direct. If you are a registered shareholder and you attend the meeting, you may deliver your completed proxy card in person.

If your shares are held in a brokerage account or by another nominee, you are considered the beneficial owner of shares held in "street name", and these proxy materials are being forwarded to you together with a voting instruction card by your broker, trustee or nominee, as the case may be. As the beneficial owner, you have the right to direct your broker, trustee or nominee how to vote, and you are also invited to attend the Annual Meeting. Since a beneficial owner is not the shareholder of record, you may not vote your shares in person at the Annual Meeting, unless you obtain a "legal proxy" from the broker, trustee or nominee that holds your shares giving you the right to vote the shares at the meeting. Your broker, trustee or nominee has enclosed or provided voting instructions for you to use in directing the broker, trustee or other nominee how to vote your shares.

*Can I change my vote after I return my proxy card?*

Yes. Even after you have submitted your proxy, you may change your vote at any time before the proxy is exercised by filing with our Secretary either a notice of revocation or a duly executed proxy bearing a later date. The powers of the proxy holders will be suspended if you attend the meeting in person and so request, although attendance at the meeting will not by itself revoke a previously granted proxy.

*What are the board's recommendations?*

Unless you give other instructions on your proxy card, the persons named as proxy holders on the proxy card will vote in accordance with the recommendations of our Board of Directors. The recommendation of the Board of Directors is included after the description of each proposal in this proxy statement. In summary, the Board of Directors recommends a vote:

 • *for* the election of the nominated slate of directors (whose biographies are contained on pages 4-5 of this proxy statement).

The Board of Directors does not know of any other matters that may be brought before the meeting. In the event that any other matter should properly come before the Annual Meeting, the proxy holders will vote as recommended by the Board of Directors or, if no recommendation is given, in accordance with their best judgment.

*What vote is required to approve each proposal?*

*Election of Directors.* The affirmative vote, either in person or by proxy, of a plurality of the votes cast at the meeting is required for the election of directors. This means that candidates who receive the highest number of votes are elected. A properly executed proxy marked "WITHHOLD AUTHORITY" with respect to the election of one or more directors will not be voted with respect to the director or directors indicated, although it will be counted for purposes of determining whether there is a quorum. Shareholders do not have the right to cumulate their votes for directors.

*Other Proposals.* For any other proposal, the affirmative vote, either in person or by proxy, of a majority of the votes cast at the meeting, either in person or by proxy, will be required for approval. A properly marked "ABSTAIN" with respect to any such matter will not be voted, although it will be counted for purposes of determining whether there is a quorum.

If you hold your shares in "street name" through a broker or other nominee, your broker or nominee may not be permitted to exercise voting discretion with respect to some of the matters to be acted upon. Thus, if you do not give your broker or nominee specific instructions, your shares may not be voted on those matters and will not be counted in determining the number of shares necessary for approval. Shares represented by such "broker non-votes" will, however, be counted in determining whether there is a quorum.

*Who pays for the preparation of the proxy?*

We will bear the cost of preparing, printing, assembling and mailing all proxy materials that may be sent to shareholders in connection with this solicitation. Arrangements will also be made with brokerage houses, other custodians, nominees and fiduciaries, to forward soliciting material to the beneficial owners of shares of our common stock held by these persons. We will reimburse these persons for reasonable out-of-pocket expenses incurred by them. *In addition to the solicitation of proxies by use of the mails, our officers and regular employees may solicit proxies without additional compensation by telephone or facsimile.* We do not expect to pay any compensation for the solicitation of proxies.

*How is the meeting conducted?*

The Chairman of the Board has broad authority to conduct the Annual Meeting in an orderly and timely manner. This authority includes establishing rules for shareholders who wish to address the meeting. The Chairman may also exercise broad discretion in recognizing shareholders who wish to speak and in determining the extent of discussion on each item of business. In light of the need to conclude the meeting within a reasonable period of time, we cannot assure that every shareholder who wishes to speak on an item of business will be able to do so. The Chairman of the Board may also rely on applicable law regarding disruptions or disorderly conduct to ensure that the meeting is conducted in a manner that is fair to all shareholders.

Only holders of our common stock as of the Record Date, or their duly appointed proxies, may attend the Annual Meeting. Our principal executive offices are located at 595 South Federal Highway, Suite 500, Boca Raton, Florida 33432, and our telephone number is (561) 208-7400. A list of shareholders entitled to vote at the Annual Meeting will be available at our offices for a period of ten days prior to the meeting and at the meeting itself for examination by any shareholder.

*How are votes tabulated?*

We will appoint two persons to serve as the Inspector of Elections and they will tabulate and certify the votes at the Annual Meeting.

3

## PROPOSAL NO. 1

### Election of Directors

Our directors are elected annually at the Annual Meeting of Shareholders and hold office until their death, resignation, retirement, removal, disqualification, or the next Annual Meeting of Shareholders or until their successors are duly elected and qualified.

The number of directors constituting the full Board of Directors currently is seven, and the term of each director will expire at the Annual Meeting. All of the current directors have been nominated for re-election to our Board of Directors at the Annual Meeting. Information about each of the nominees is given below. If elected, each of the nominees shall serve until the next Annual Meeting of Shareholders, expected to be held in March 2010, or until their successors have been duly elected and qualified.

We have no reason to believe that any of the nominees will be unable to serve as director. However, in the event that any nominee should become unable or unwilling to serve as a director, the proxy will be voted for the election of the person or persons as shall be nominated by our Board of Directors.

### Nominees for Re-election

Joseph S. DiMartino, 65, was appointed to our Board of Directors on September 9, 2005, to fill a vacancy on our Board. Mr. DiMartino was nominated by Coconut Palm Capital Investors II, Ltd. ("Coconut Palm"), in accordance with a Purchase Agreement, dated November 17, 2004, between us and Coconut Palm. Mr. DiMartino has been the Chairman of the Board and a Director of The Dreyfus Family of Mutual Funds in New York City since January 1995. Mr. DiMartino served as President, Chief Operating Officer and Director of The Dreyfus Corporation from October 1982 until December 1994. Mr. DiMartino also has served since 1997 as a Director and Chairman of the Compensation Committee of Century Business Services, Inc., and also serves as a Director of The Newark Group and the Muscular Dystrophy Association. Mr. DiMartino is a 1965 graduate of Manhattan College and attended New York University's Graduate School of Business.

Mario B. Ferrari, 31, was appointed Vice Chairman of our Board of Directors on February 4, 2005, at the Annual Meeting of Shareholders. Mr. Ferrari is a partner and co-founder of Royal Palm Capital Partners ("RPCP"), a private investment and management firm, since its inception in 2002. Mr. Ferrari also serves as a director of publicly held Devcon International Corp. since July 2004. Mr. Ferrari also serves as Chief Strategic Officer of Equity Media Holdings Corporation. From June 2000 to June 2002, Mr. Ferrari was an investment banker with Morgan Stanley & Co. In October, 1997, Mr. Ferrari co-founded PowerUSA, LLC, a retail renewable energy services company and was a managing member until September 1999. Mr. Ferrari received his B. S., magna cum laude, in Finance and International Business from Georgetown University in 2000.

Robert C. Griffin, 60, has served as a Director since February 2008. Mr. Griffin has held numerous positions of responsibility in the financial sector, including Head of Investment Banking, Americas and Management Committee Member for Barclay's Capital from 2000 to 2002, and prior to that as the Global Head of Financial Sponsor Coverage for Bank of America Securities from 1998 to 2000 and Group Executive Vice President of Bank of America from 1997 to 1998. Mr. Griffin also currently serves as a Director of Builders FirstSource, Inc. and Commercial Vehicle Group, Inc.

Arnold Heggestad, Ph.D., 65, was appointed to our Board of Directors in March 2003. Dr. Heggestad is the Holloway Professor of Finance and Entrepreneurship at the University of Florida and has been at the University since 1974. Dr. Heggestad has served as Chairman, Department of Finance, Insurance and Real Estate, Associate Dean, College of Business Administration, Director of the Center for Financial Institutions, Executive Director, University of Florida Research Foundation, Associate Vice-President of Entrepreneurial Programs in the Office of Research. Dr. Heggestad is a Director of Intrepid Capital Management, Inc. He has been very active in public service and has served both public and private interests in a number of capacities.

Steven P. Oppenheim, 62, was appointed to our Board of Directors in January 2004, and currently serves on its Audit, Nominating, and Compensation Committees. Mr. Oppenheim is the President and owner of Oppenheim & Associates, Atlanta, Georgia, which, since 2001 has provided a wide range of consulting and strategic planning

4

services to a diversified international clientele in the U.S., Europe and Latin America. Mr. Oppenheim holds a Juris Doctor Degree and maintained his own law firm from 1975 until 2000. Mr. Oppenheim also holds a Bachelor of Business Administration in Accounting from the University of Miami, and from 1973 to 1975 he was tax supervisor with the public accounting firm of Coopers & Lybrand. Mr. Oppenheim serves in various officer capacities for several multinational companies or affiliates involving U.S. business. He serves as a Director of the International Advertising Association and as a Director of the British American Chamber of Commerce. He previously served as a Director of the French-American Chamber of Commerce, Italy-America Chamber of Commerce, and European-American Chamber of Commerce.

Richard C. Rochon, 51, was appointed Chairman of our Board of Directors on February 4, 2005, at the Annual Meeting of Shareholders in connection with Coconut Palm's investment in the Company, as described in the Purchase Agreement, dated November 17, 2004, between us and Coconut Palm. Mr. Rochon has served as Chairman and Chief Executive Officer of Royal Palm Capital Partners LLLP, a private investment and management firm, since 2002. Mr. Rochon also has served as a Director of Devcon International Corp., a publicly-held company that provides electronic security and construction services, since July 2004, and as Chairman and Chief Executive Officer of Coconut Palm Acquisition Company, a publicly held special purpose acquisition company, from September 2005 until June 2007. Previously, from 1987 to 2002, Mr. Rochon served as President of Huizenga Holdings, Inc, a management and holding company owned by H. Wayne Huizenga, whose investments included Blockbuster Entertainment Corporation, Republic Waste Industries, Inc., AutoNation, Inc., and Boca Resorts, Inc. Mr. Rochon joined Huizenga Holdings in 1985 as Treasurer and was promoted to President in 1987. Mr. Rochon served as Vice Chairman of Huizenga Holdings and as sole Director for many of Huizenga Holdings' private and public portfolio companies, including as a Director of AutoNation, Inc., the NHL's Florida Panthers and the NFL's Miami Dolphins. Mr. Rochon previously served as Vice Chairman of Boca Resorts, Inc, an owner and operator of luxury resort properties in Florida, from November 1996 to December 2004, while serving as President from March 1998 until January 2002. In addition, Mr. Rochon has been a Director of Bancshares of Florida, a full-service commercial bank, from 2002 until February 2007, and a Director of Century Business Services, a diversified services company, since 1996. From 1979 until 1985 Mr. Rochon was employed as a certified public accountant by the public accounting firm of Coopers & Lybrand. L.L.P. Mr. Rochon received his B.S. in Accounting from Binghamton University (formerly State University of New York at Binghamton) in 1979 and his Certified Public Accounting designation in 1981.

Charles P. Steinmetz, 69, was appointed to our Board of Directors in June 2005, and was appointed to serve as the Chief Executive Officer of Middleton Pest Control, Inc. ("Middleton"), effective as of January 18, 2008. Mr. Steinmetz was nominated to serve as a director by Coconut Palm, in accordance with the Purchase Agreement and a Stock Purchase Agreement dated June 7, 2005, between our subsidiary, Sunair Southeast Pest Holdings, Inc. ("SSPH"), and the selling shareholders of Middleton. Mr. Steinmetz was the majority owner of Middleton from 1977 until it was purchased by SSPH. Mr. Steinmetz also served in various capacities with Orkin Exterminating Company (1961-1973) and Truly Nolen, Inc. (1974-1977), and led the build-up and sale of All America Termite and Pest Control, Inc. (1982-1997), which at the time of sale was the largest privately owned pest control company in the United States with 125 locations throughout Florida, Georgia, Alabama, North and South Carolina, Louisiana, Tennessee, Mississippi, Arizona and Texas. Mr. Steinmetz received his B.S. in Agriculture, major in Entomology, from the University of Florida.

**OUR BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE ELECTION OF ALL NOMINEES NAMED ABOVE.**

5

## CORPORATE GOVERNANCE

We maintain a corporate governance page on our website which includes key information about our corporate governance initiatives, including the Company's Code of Ethical Conduct and charters for the Audit Committee, the Compensation Committee and the Nominating Committee. Our corporate governance page is available at our web site at www.sunairservices.com under the Corporate Governance tab found in the IR/Home section.

### *Independent Directors*

A majority of the members of our Board of Directors is independent according to the corporate governance rules of the American Stock Exchange ("AMEX"). In particular, our Board of Directors has in the past evaluated, and our Nominating Committee will in the future evaluate, periodically the independence of each member of the Board of Directors.

The Board of Directors has determined that the following four individuals currently serving on the Board of Directors are independent as defined by the listing standards of the AMEX: Joseph S. DiMartino, Robert C. Griffin, Arnold Heggestad, Ph.D. and Steven P. Oppenheim.

### Code of Ethical Conduct

We have adopted a Code of Ethical Conduct that includes provisions ranging from restrictions on gifts to conflicts of interest. All employees are bound by this Code of Ethical Conduct, violations of which may be reported to the Audit Committee. The Code of Ethical Conduct includes provisions applicable to our senior executive officers consistent with the Sarbanes-Oxley Act of 2002. This Code of Ethical Conduct is available on our website located at www.sunairservices.com under the Corporate Governance tab found in the IR/Home section. We intend to post on our website amendments to or waivers from our Code of Ethical Conduct.

### Director Compensation

We use a combination of cash and equity-based incentive compensation to attract and retain qualified candidates to serve on the Board. In setting director compensation, we consider the significant amount of time that directors expend in fulfilling their duties, as well as the skill-level required by us of members of the Board. During fiscal 2008, all of our Board members were non-employee directors (except Charles P. Steinmetz served as the CEO of Middleton from January 18, 2008 until July 25, 2008). Mr. Steinmetz did not receive any cash compensation for serving as the CEO of Middleton during this interim period.

### *Cash Compensation*

Non-employee directors were paid an annual cash retainer of $28,000, plus additional cash retainers for serving as a Chair of a committee during fiscal 2008. These annual retainers are paid in quarterly installments and are listed in the following table:

| Position | Annual Amount ($) |
|---|---|
| Board Member | 28,000 |
| Chair of Audit Committee | 5,000 |
| Chair of the Compensation Committee | 5,000 |
| Chair of the Nominating Committee | 5,000 |

During fiscal 2008, we also paid each non-employee director attendance fees for each Board or committee meeting. Each non-employee director received $1,500 for attendance at each Board of Director's meeting. We paid the Chairman of our Audit Committee $1,500 for each meeting of the Audit Committee meeting attended and the other members of the Audit Committee received $1,250 for each Audit Committee meeting attended. We paid the Chairman of our Compensation Committee $1,500 for each meeting of the Compensation Committee meeting attended and the other members of the Compensation Committee received $1,250 for each Compensation Committee meeting attended. We paid the Chairman of our Nominating Committee $1,500 for each meeting

6

of the Nominating Committee meeting attended and the other members of the Nominating Committee received $1,250 for each Nominating Committee meeting attended. We reimburse non-employee directors for out-of-pocket expenses incurred in connection with attending Board and committee meetings.

Also, in November 2007, the Board formed an Independent Directors Committee ("Directors Committee") consisting of Messrs. Burke, DiMartino, Heggestad, Oppenheim and Steinmetz, to determine whether to renew and/or terminate the Management Services Agreement with RPC Financial Advisors, LLC. The Director's Committee then formed a Sub-Committee of Messrs. Heggestad, Oppenheim and Steinmetz to review the issues relating to the decision, and report back to the full Committee. We paid each member of the full Directors Committee, which met three times, $1,500 per meeting, and each member of the Sub-Committee, which met three times, $1,250 per meeting.

In August 2008, a special committee ("Special Committee") of the Board of Directors was formed, consisting of Mr. Griffin, who was appointed the Chairperson, and Messrs. Heggestad and Steinmetz, to review an unsolicited offer for the sale of the Company and other strategic alternatives. The Special Committee met five times during fiscal 2008. We paid the Chairman of the Special Committee $1,500 for each meeting and the other members of the Special Committee received $1,250 for each meeting.

### Equity-Based Compensation

To ensure that directors have an ownership interest aligned with our stockholders, from time to time we may also grant options to purchase shares of our common stock to our non-employee directors under our 2004 Stock Incentive Plan ("Plan" or "2004 Stock Plan"). Each of our non-employee directors receive 5,000 options to purchase shares of our common stock for each year of service, which vest quarterly during each year of service, and any new directors who are not full-time employees of our Company receive 20,000 options to purchase shares of our common stock upon joining the Board of Directors, which vest quarterly over the first year of service. The exercise price of the options is equal to the closing price of the Company's common stock on the date of grant.

### Director Compensation Table

The following table sets forth with respect to the named director, compensation information inclusive of equity awards and payments made in the fiscal year ended September 30, 2008. All option awards were granted from our 2004 Stock Plan. The amounts reflected in columns (c) below do not reflect compensation actually received by the directors during 2008. Instead, these amounts reflect the compensation costs recognized by us in fiscal year 2008 for financial statement reporting purposes in accordance with SFAS 123R. For information regarding the assumptions made in calculating the amounts reflected in this column, see Footnote 10 — Stock Options to our audited financial statements for the year ended September 30, 2008, included in our Annual Report on Form 10-K for fiscal 2008.

### NON-EMPLOYEE DIRECTORS' COMPENSATION SUMMARY

| (a)<br>Name | (b)<br>Fees<br>Earned or<br>Paid in<br>Cash<br>($) | (c)<br>Option<br>Awards<br>($) | Total |
|---|---|---|---|
| Joseph Burke(1) | $ 36,750 | $ 3,740 | $40,490 |
| Joseph S. DiMartino | 62,000 | 6,881 | 68,881 |
| Mario B. Ferrari | 41,500 | 6,881 | 48,381 |
| Robert Griffin | 30,750 | 12,564 | 43,314 |
| Arnold Heggestad, Ph.D. | 78,000 | 6,881 | 84,881 |
| Steven P. Oppenheim | 91,000 | 6,881 | 97,881 |
| Richard C. Rochon | 40,000 | 6,881 | 46,881 |
| Charles P. Steinmetz | 56,000 | 6,881 | 62,881 |

7

(1) Represents compensation that Mr. Burke received for serving as a director for 4 ¾ months in fiscal 2008. Mr. Burke had served as director of the Company from February 2006 through February 2008. He did not stand for re-election at the 2008 Annual Shareholder Meeting.

**Director Compensation in Fiscal 2009**

Effective October 1, 2008, the cash compensation for the Board of Directors was changed to a flat fee arrangement as opposed to a, per meeting, fee basis. The directors, with the exception of Richard C. Rochon who has decided to forego his director fees, will be receiving an annual amount of $45,000 paid in equal quarterly installments of $11,250. Additionally, the Chairman of the Audit Committee will receive $10,000 per annum to be paid in equal quarterly installments, and the Chairman of the Compensation Committee will receive $5,000 annually to be paid in equal quarterly installments. The only exception to this is the Special Committee which will continue to receive per meeting fees of $1,500 for the Chairman and $1,250 for committee members.

**Board Committees and Meetings**

During fiscal 2008, the Board met 9 times and acted by written consent 2 times. Each director attended at least 75% of all meetings of the Board and the committees of the Board on which he serves.

We have three standing committees: the Audit Committee, the Compensation Committee and the Nominating Committee. Each of these committees has a written charter approved by the Board of Directors. A copy of each charter is available on our website located at www.sunairservices.com under the Corporate Governance tab found in the IR/Home section. The members of our standing committees, as of the date of this proxy statement, are identified in the following table.

| Director | Audit Committee | Compensation Committee | Nominating Committee | Special Committee |
|---|---|---|---|---|
| Joseph S. DiMartino | | * | * | |
| Mario B. Ferrari | | | | |
| Robert C. Griffin | * | | | ** |
| Arnold Heggestad Ph.D. | ** | | | |
| Steven P. Oppenheim | * | ** | ** | * |
| Richard C. Rochon | | | | |
| Charles P. Steinmetz | | | | * |

\* Member
\*\* Chair

*Audit Committee*

Our Audit Committee assists our Board of Directors in monitoring the integrity of our financial statements and compliance with requirements as set forth in the Public Company Accounting Oversight Board's Auditing Standards. Its responsibilities include the maintenance of free and open communications among the directors, our independent registered public accounting firm and financial management of the Company. The Audit Committee held 14 meetings and acted by written consent 1 time during fiscal 2008. Our Board of Directors has determined that: (i) all current Audit Committee members are "independent" as that concept is defined in the applicable rules of AMEX and the Securities and Exchange Commission ("SEC"), (ii) all current committee members are financially literate, and (iii) all current committee members qualify as "Audit Committee financial experts" under the applicable rules of the SEC. In making the determination as to Messrs. Griffin, Heggestad's and Oppenheim's status as Audit Committee financial experts, our Board of Directors determined they have accounting and related financial management expertise within the meaning of the aforementioned rules as well as the listing standards of AMEX.

8

### Report of the Audit Committee

*The following Report of the Audit Committee does not constitute soliciting material and should not be deemed filed or incorporated by reference in any other filing by us under the Securities Act of 1933 or the Securities Exchange Act of 1934.*

The Audit Committee of our Board of Directors is established under our Audit Committee charter adopted by our Board of Directors on May 30, 2000. A copy of our Audit Committee's charter is available on our website at www.sunairservices.com,

Our management is responsible for our internal controls and the financial reporting process. Our independent auditors are responsible for performing the independent audit of our consolidated financial statements in accordance with auditing standards generally accepted in the United States of America and for issuing a report thereon. Our Audit Committee is comprised of three non-management directors and its responsibility is generally to monitor and oversee the processes described in our Audit Committee charter. Our Audit Committee relies, without independent verification, on the information provided to it and on the representations made by management and the independent auditors that the financial statements have been prepared in conformity with generally accepted accounting principles. Each member of our Audit Committee is independent in the judgment of our Board of Directors as required by the listing standards of AMEX, the Sarbanes-Oxley Act of 2002 and the rules and regulations of the SEC adopted under Sarbanes-Oxley, as of this date. With respect to the period ended September 30, 2008 the Audit Committee performed the following:

- Reviewed and discussed with our management and the independent auditors our audited consolidated financial statements as of September 30, 2008;

- Discussed with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committee, as amended, as adopted by the Public Company Accounting Oversight Board in Rule 3200T, and Statement on Auditing Standards No. 90, Audit Committee Communication, as amended, as adopted by the Public Company Accounting Oversight Board in Rule 3600T;

- Discussed with the independent auditors the firm's independence; and

- Received from the independent auditors written affirmation of their independence as required by Independence Standards Board Standard No. 1, *Independence Discussions with Audit Committees.*

Based upon the review and discussions referred to above, and subject to the limitations on its role and responsibilities described above and in our Audit Committee charter, our Audit Committee recommended to our Board of Directors that our audited consolidated financial statements be included in our Annual Report on Form 10-K for the year ended September 30, 2008 for filing with the SEC.

Submitted by the Audit Committee of the Board of Directors.

**Audit Committee**
Arnold Heggestad Ph.D.
(Chairperson)

Robert C. Griffin          Steven P. Oppenheim

*Compensation Committee*

The Compensation Committee's basic responsibility is to review the performance and development of the Company's management in achieving corporate goals and objectives and to assure that the Company's executive officers are compensated effectively in a manner consistent with the Company's strategy, competitive practice, sound corporate governance principles and shareholder interests. Toward that end, the Compensation Committee (i) will review and approve the compensation of the Company's Chief Executive Officer and other executive officers, (ii) will review and make recommendations with respect to the Company's existing and proposed

9

compensation plans, and (iii) will administer grants and awards to employees under the Company's 2004 Stock Incentive Plan. During fiscal 2008, the Compensation Committee held 11 meeting(s). Our Board of Directors has determined that each member of the Compensation Committee is (i) an independent director under applicable AMEX listing standards, (ii) an "outside director" as defined in Section 162(m) of the Internal Revenue Code and (iii) a "non-employee director" as defined in Rule 16b-3 under the Securities Exchange Act of 1934.

### Nominating Committee

The Nominating Committee has been assigned the functions of (i) soliciting, considering, recommending and nominating candidates to serve on the Board of Directors under criteria adopted by it from time to time; (ii) advising the Board of Directors with respect to its composition, procedures and committees; (iii) overseeing periodic evaluations of the Board of Directors and its committees, including establishing criteria to be used in connection with such evaluations; and (iv) reviewing and reporting to the Board of Directors on a periodic basis with regard to matters of corporate governance. During fiscal 2008, the Nominating Committee held 2 meeting(s). Our Board of Directors has determined that each member of the Nominating Committee is an independent director under applicable AMEX listing standards.

If a shareholder wishes to recommend a nominee for director, written notice should be sent to the Corporate Secretary in accordance with the instructions set forth later in this proxy statement under the caption "Other Information — Information Concerning Shareholder Proposals" beginning on page 25. Each written notice must set forth: (1) the name and address of the shareholder who is making the nomination; (2) the number of shares of our common stock which are beneficially owned by the shareholder and a representation that the shareholder is a holder of record of our common stock entitled to vote at the Annual Meeting of shareholders and intends to appear in person or by proxy at the meeting and nominate the person specified in the notice; (3) the name of the director candidate; (4) a complete resume or statement of the candidate's qualifications (including education, work experience, knowledge of our industry, membership on the Board of Directors of another corporation and civic activity); (5) a description of all arrangements or understandings between the shareholder and the candidate and/or any other person or persons pursuant to which the nomination is to be made by the shareholder; (6) such other information regarding a candidate as would be required to be included in a proxy statement, including information with respect to a candidate's independence as defined under the rules and regulations promulgated by the SEC and the American Stock Exchange and information regarding the candidate's attributes that the members of the Nominating Committee would need to consider in order to assess whether such candidate would qualify as an "Audit Committee financial expert" as defined by the rules and regulations promulgated by the SEC; and (7) the candidate's consent to serve as a director of our company if elected.

The suitability of potential candidates nominated by shareholders will be evaluated in the same manner as other candidates that are identified by the Nominating Committee. In making its nominations, the Nominating Committee will identify candidates who meet the current challenges and needs of the Board of Directors. In making such decisions, the Nominating Committee will consider, among other things, an individual's business experience, industry experience, financial background and experiences and whether the individual meets the independence requirements of the American Stock Exchange. The Nominating Committee will use multiple sources for identifying and evaluating nominees for directors including referrals from current directors, recommendations by shareholders and input from third party executive search firms.

10

## CURRENT DIRECTORS AND EXECUTIVE OFFICERS

The following table sets forth our current directors and executive officers as of January 28, 2009. Our directors are elected annually and hold office until their death, resignation, retirement, removal, disqualification, or the next Annual Meeting of Shareholders or until their successors are duly elected and qualified. There is no family relationship between or among any of our directors and executive officers. Our current Board of Directors consists of seven persons.

| Name | Age | Position |
|------|-----|----------|
| Jack I. Ruff | 53 | Chief Executive Officer |
| Edward M. Carriero, Jr. | 53 | Chief Financial Officer |
| Joseph S. DiMartino | 65 | Director |
| Mario B. Ferrari | 31 | Vice Chairman of the Board |
| Robert C. Griffin | 60 | Director |
| Arnold Heggestad, Ph.D. | 65 | Director |
| Steven P. Oppenheim | 62 | Director |
| Richard C. Rochon | 51 | Chairman of the Board |
| Charles P. Steinmetz | 69 | Director and Chief Executive Officer of Middleton |

Below is a summary of the business experience of our executive officers who do not serve on our Board of Directors. The business experience of the nominees to our Board of Directors appears under the caption "*Nominees for Re-election*" beginning on page 4.

Jack I. Ruff has served as the Chief Executive Officer and President of the Company and Middleton since July 25, 2008. Mr. Ruff is a co-founder of Royal Palm Capital, Inc. ("RPCP") and has been a partner of RPCP since September 2002 through the present date. Mr. Ruff has also served as vice president and director of Royal Palm Capital Management, Inc., since February 2005 through the present date. Prior thereto, Mr. Ruff served as Senior Vice President with Bank of America, N.A., where for over 18 years he was responsible for mergers and acquisitions and financing high growth public and private middle market companies. In this capacity, he evaluated and structured transactions using public and private equity, public and private senior debt and mezzanine securities. In addition, he was the Market Executive for Bank of America's Financial Strategies Group where he managed a group of professional bankers focused on the middle market in Florida. Prior to joining Bank of America (formerly NationsBank) in 1984, he was employed for seven years by The First National Bank of Chicago's Global Banking Group. Mr. Ruff received his B.S. in Finance and Economics from Indiana University.

Edward M. Carriero, Jr. has served as our Chief Financial Officer since February 2008 and as our Interim Chief Financial Officer since September 8, 2006. Mr. Carriero replaced our former Chief Financial Officer, Synnott B. Durham, who resigned after we sold substantially all of the assets of our high frequency single sideband communication business. Mr. Carriero also served as the Chief Financial Officer of Middleton from February 2006 through February 2007. Prior to joining Middleton, from July 2003 to February 2006, Mr. Carriero served as the revenue auditor for Broward County Port Everglades, a large seaport in South Florida. From October 2001 to July 2003, Mr. Carriero served as CFO of Apex Maintenance Services, Inc., a roofing contractor. From June 1998 to October 2001, Mr. Carriero provided consulting services to various businesses. From June 1991 to June 1998, Mr. Carriero held several operating positions for Huizenga Holdings, Inc., including: executive vice president/chief financial officer and director for Life General Security Insurance Company, a $100 million life and health insurance company operating in 27 states; executive vice president/chief operating officer for Blue Ribbon Water Company, a bottled water delivery company; and vice president and general manager of Suncoast Helicopters, Inc., a helicopter charter company. Mr. Carriero received his Bachelor of Science in accounting from Saint Francis College in Brooklyn, N.Y. and his MBA from the University of Miami.

11

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table shows as of January 28, 2009, the Record Date (or such other date indicated in the footnotes below), the number of shares beneficially owned and the percentage ownership of our common stock, by the following: (a) each of our Named Executive Officers, who was employed by us as of the Record Date, (b) each of our directors, (c) all of our Named Executive Officers and directors as a group and (d) each person known to management to own beneficially more than 5% of our outstanding common stock.

As used herein, the term beneficial ownership with respect to a security is defined by Rule 13d-3 under the Securities Exchange Act of 1934 as consisting of sole or shared voting power (including the power to vote or direct the vote) and/or sole or shared investment power (including the power to dispose or direct the disposition of) with respect to the security through any contract, arrangement, understanding, relationship or otherwise, including a right to acquire such power(s) during the next 60 days. Unless otherwise noted, beneficial ownership consists of sole ownership, voting and investment rights. The address for each named Executive Officer and director is care of Sunair Services Corporation, 595 South Federal Highway, Suite 500, Boca Raton, FL 33432.

| Name | Amount and Nature of Beneficial Ownership | Percent of Class |
|---|---|---|
| **Directors and Named Executive Officers** | | |
| Jack I. Ruff | 0 | * |
| Edward M. Carriero(1) | 40,625 | * |
| Joseph S. DiMartino(2) | 70,000 | * |
| Mario B. Ferrari(3)(10) | 9,929,700 | 54.89% |
| Robert C. Griffin(4) | 20,000 | * |
| Arnold Heggestad, Ph.D.(5) | 58,000 | * |
| Steven P. Oppenheim(6) | 35,000 | * |
| Richard C. Rochon(7)(10) | 9,929,700 | 54.89% |
| Charles P. Steinmetz(8) | 439,024 | 3.35% |
| All directors and executive officers as a group (9 persons)(9) | 10,582,649 | 59.80% |
| **Other 5% or Greater Shareholders** | | |
| Coconut Palm Capital Investors II, Ltd.(10) | 9,914,700 | 54.80% |
| Michael Brauser(11) | 1,070,176 | 7.88% |
| Michael Herman(11) | 2,180,600 | 16.66% |
| Dru A. Schmitt(11) | 1,486,014 | 11.35% |
| Joseph Q. DiMartini(11) | 314,400 | 2.40% |
| Barry Honig(11) | 126,170 | * |
| Leon Brauser(11) | 80,000 | * |
| Massey Services, Inc.(12) | 1,260,972 | 9.63% |
| Par Investment Partners, L.P.(13) | 661,502 | 5.05% |

---

\* Less than 1%.

(1) Includes 20,000 shares held by Mr. Carriero's wife in her IRA account and 20,625 shares issuable upon currently exercisable options or options exercisable within 60 days of the Record Date.

(2) Includes 40,000 shares held directly by Mr. DiMartino and 30,000 shares issuable upon exercise of currently exercisable options or options exercisable within 60 days of the Record Date.

(3) Shares consist of: (i) 15,000 shares issuable upon exercise of currently exercisable options or options exercisable within 60 days of the Record Date; and (ii) all shares beneficially owned by Coconut Palm (assumes beneficial ownership of such shares is attributed to Mr. Ferrari, and Mr. Ferrari disclaims beneficial ownership of these shares).

12

(4) Includes 20,000 shares issuable upon currently exercisable options or options exercisable within 60 days of the Record Date.

(5) Includes 35,000 shares issuable upon currently exercisable options or options exercisable within 60 days of the Record Date.

(6) Consists of 35,000 shares issuable upon currently exercisable options or options exercisable within 60 days of the Record Date.

(7) Shares consist of: (i) 15,000 shares issuable upon exercise of currently exercisable options or options exercisable within 60 days of the Record Date; and (ii) all shares beneficially owned by Coconut Palm (assumes beneficial ownership of such shares is attributed to Mr. Rochon, and Mr. Rochon disclaims beneficial ownership of these shares).

(8) Includes 27,500 shares issuable upon exercise of currently exercisable options or options exercisable within 60 days of the Record Date.

(9) Includes 198,125 shares issuable upon exercise of currently exercisable options or options exercisable within 60 days of the Record Date.

(10) Consists of 4,914,700 shares of our common stock and 5,000,000 shares of our common stock underlying warrants that are immediately exercisable. 9,808,197 of the 9,914,700 shares of Common Stock consist of an aggregate of 4,843,698 shares of Common Stock and 4,964,499 shares of Common Stock underlying warrants that are immediately exercisable, which Coconut Palm has the sole power to vote pursuant to proxy agreements executed by its limited partners upon the redemption of their limited partnership interests in Coconut Palm. Richard C. Rochon, Chairman of our Board of Directors, and Mario B. Ferrari, Vice Chairman of our Board of Directors, are the natural persons who exercise voting and investment control over the shares.

(11) This information was obtained from the Company's records and a Schedule 13G filed by Mr. Brauser, Dru Schmitt, Michael Herman, Joseph Q. DiMartini, Barry Honig and Leon Brauser on October 21, 2008. The Schedule 13G states that these shareholders have orally agreed to act together to cause the Company to be sold with the net proceeds being distributed to the shareholders. With respect to Mr. Brauser, Schmitt and Dr. Martini, it includes warrants to purchase 490,476, 285,714 and 95,239 shares of the Company's common stock, respectively. The mailing address for the individuals are as follows: Mr. Brauser and Mr. Honing is 595 S. Federal Highway, Suite 600, Boca Raton, FL 33432; Mr. Schmitt at 13 Twin Springs Lane, St. Louis, MO 63124.; Mr. Herman at 1160 Lake Plaza Drive, Suite 210, Colorado Springs, CO 80906; Mr. DiMartini at 4 Carrsworld, Clayton, MO 63105 and Leon Brauser at 7218 Ayshire Lane, Boca Raton, FL 33496.

(12) This information was obtained from a Schedule 13D filed by Massey Services, Inc. ("Massey") on October 30, 2008. The mailing address for Massey is 315 Groveland Street, Orlando, Florida 32804. Massey entered into a 180-day consulting agreement with Michael Brauser on September 19, 2008. See Footnote 11. Under the agreement if Massey acquires the Company while the consulting agreement is in effect, Mr. Brauser will be paid a cash fee of $1,000,000 at closing if the acquisition closes, provided Mr. Brauser has performed his services as set forth in the consulting agreement.

(13) This information was obtained from a Schedule 13G filed by Par Investment Partners, L.P. on March 3, 2008. The mailing address to Par Investment Partners, L.P. is PAR Capital Management, Inc. One International Place, Suite 2401, Boston, MA 02110

**Certain Voting Arrangements**

Between August 31, 2005 and December 20, 2008, one of our shareholders, Coconut Palm distributed an aggregate of 4,843,698 shares of our common stock plus warrants to purchase 4,964,499 additional shares of common stock to certain of its limited partners in exchange for the redemption of their respective limited partnership interests. In accordance with Coconut Palm's limited partnership agreement, Coconut Palm's limited partners who had requested redemption paid to Coconut Palm an aggregate of $28,000 for legal fees incurred by Coconut Palm in connection with the redemption of the limited partnership interests. Coconut Palm's limited partners include Messrs. Brauser, Ferrari, Hayes, Rochon and Schmitt. In connection with the distributions of shares, Coconut Palm's limited partners granted to Coconut Palm, Inc., the general partner of Coconut Palm, a

13

proxy to vote, in its sole discretion, a significant portion of the securities owned by the limited partners at any meeting of the Company's shareholders, as well as in any action by written consent of the Company's shareholders.

**Change in Control**

On February 8, 2005, we closed a transaction with Coconut Palm, which we entered into on November 17, 2004. Coconut Palm purchased from us 5,000,000 units ("Units") for an aggregate purchase price of $25 million. Each Unit consisted of (i) one share of our common stock, (ii) one warrant to purchase one share of our common stock at an exercise price of $6 per share with a term of three years which expired on February 7, 2008 and (iii) one warrant to purchase one share of our common stock at an exercise price of $7 per share with a term of five years to expire on February 7, 2010. Coconut Palm obtained the $25 million in a private placement of its equity. Following the closing of the transaction, Coconut Palm beneficially owned 15 million shares, or approximately 78.9% of our then outstanding shares of common stock. Currently, Coconut Palm beneficially owns approximately 54.78% of our outstanding shares of common stock.

**Compliance with Section 16(a) of the Securities Exchange Act of 1934**

Section 16(a) of the Securities Exchange Act of 1934 requires our directors and executive officers, and persons who own more than 10 percent of our common stock, to file with the SEC initial reports of ownership and reports of changes in ownership of our common stock. Officers, directors and greater than 10 percent shareholders are required by the rules and regulations of the SEC to furnish us with copies of all Section 16(a) forms they file.

To our knowledge, based solely on review of the copies of these reports furnished to us and representations that no other reports were required, during the fiscal year ended September 30, 2008, all Section 16(a) filing requirements applicable to our officers, directors and greater than 10 percent beneficial owners were complied with.

14

## EXECUTIVE COMPENSATION

### Overview

The following section describes the material elements of compensation for the Company's executive officers identified in the Summary Compensation Table. We refer to these officers as the Named Executive Officers. The Compensation Committee makes all decisions for the total direct compensation — that is, the base salary, bonus awards, stock options and other equity compensation — of our executive officers, including the Named Executive Officers. The Compensation Committee's recommendations for the total direct compensation of our Chief Executive Officer are subject to approval of our Board of Directors.

### Compensation Philosophy and Objective of Compensation

With respect to executive compensation, the primary goal of the Compensation Committee is to attract and retain the most qualified, knowledgeable, dedicated and seasoned executives possible, to reward them for their contributions to the development of the Company's business and to align the executives incentives with shareholder value creation. Beyond that, different elements of our executive compensation are designed to engender different behaviors.

- Base salary and benefits are designed to attract and retain employees over time.
- Long-term incentives — stock options under our 2004 Stock Incentive Plan — focuses executives' efforts on the behaviors within the recipients' control that they believe are necessary to ensure our long-term success, as reflected in increases to our stock prices, growth in our earnings per share and other elements.
- Annual discretionary cash bonuses and performance based bonuses, which are individually designed to address business needs related to attracting and retaining employees and to provide incentives to achieve the short-term goals our management and Board of Directors established for the one year period in question.
- Severance and change in control provisions are designed to facilitate our ability to attract and retain executives as we compete for talented employees in a marketplace where such protections are commonly offered.

#### *Base Salary*

The base salary for our executive officers is based on job responsibilities and individual contributions to the Company. Additional factors include the salary received by the executive at his previous place of employment and individual negotiations between the Company and the executive. No independent consulting firm was retained to conduct this review.

Our Named Executives Officers and our former Named Executive Officers are or were parties to employment agreements with us, which set forth the base salary for the respective Named Executive Officer, subject to adjustment. These Named Executive Officers are Jack Ruff, our current Chief Executive Officer and Edward Carriero, our Chief Financial Officer. The former Named Executive Officers are Colin Mulford, who served as the President of Telecom FM Limited ("Telecom FM"), our telecommunications subsidiary, from October 2004 through August 31, 2008, when it was sold to a company organized and owned by its former executive management team, and John Hayes, who served as our Chief Executive Officer from October 29, 2007 through September 23, 2008.

Additionally, we have listed Gregory Clendenin and Charles Steinmetz as Named Executive Officers because each held Chief Executive Officer positions ("CEO") with the Company during fiscal 2008. Mr. Clendenin served as the CEO of Middleton and Sunair Southeast Pest Holdings, Inc. ("SSPH") from June 7, 2005 through October 29, 2007 and Mr. Steinmetz served as the CEO of Middleton from January 18, 2008 through July 25, 2008.

The Compensation Committee intends on reviewing the base salaries for Named Executive Officers, on the anniversary dates of the employment agreements or from time to time as considered necessary. Base salaries paid to executive officers are deductible for federal income tax purposes except to the extent that the executive is a covered employee under Section 162(m) of the Internal Revenue Code and the executive's aggregate compensation which is

DEF 14A

subject to Section 162(m) exceeds $1 million. No employee received base salary in excess of $1 million in fiscal 2008.

Base salary and bonus payments are the only elements of compensation that are used in determining the amount of contributions permitted under our 401(k) Plan.

### Discretionary Bonus Awards

The Compensation Committee has the ability to award discretionary annual cash bonuses to any of our executive officers. During fiscal 2008, the Compensation Committee did not award any discretionary annual bonuses to any executive officer but may elect to do so in the future with the intention to compensation officers for achieving financial and/or operational goals and for achieving individual annual performance objectives.

### Long-Term Incentive Plan and Stock Options

We believe that long-term performance is achieved through an ownership culture that encourages such performance by our executive officers through the use of stock-based awards. Our 2004 Stock Option Plan was established to provide certain of our employees, including our executive officers, with incentives to help align those employees' interests with the interests of our shareholders. The Compensation Committee believes that the use of stock-based awards offers an additional method to achieving our compensation goals. Our 2004 Stock Option Plan has provided the principal method for our executive officers to acquire equity or equity-linked interests in our Company without the adoption of stock ownership guidelines. We expect to continue to provide a portion of total compensation to our executives through our 2004 Stock Option Plan rather than through additional cash-based compensation.

Our 2004 Stock Option Plan authorize us to grant officers, directors, employees and prospective employees incentive stock options, non-qualified stock options, restricted stock awards, other equity awards and performance based stock incentives. Our Compensation Committee is the administrator of the 2004 Stock Option Plans and determines the terms of the stock option or other stock award, including but not limited to the price, numbers of shares, grant date and vesting terms. The Compensation Committee reviews and approves stock option and other stock awards to executive officers based upon a review of competitive compensation data, its assessment of individual performance, and retention considerations, as well as a review the individual's existing share and option holdings. Periodic stock option grants are made at the discretion of the Compensation Committee.

Stock options provide for financial gain derived from the potential appreciation in stock price from the date that the option is granted until the date that the option is exercised. The exercise price of stock option grants is set at fair market value on grant date. Under our 2004 Stock Option Plan, we may not grant stock options at a discount to fair market value or reduce the exercise price of outstanding stock options, except in the case of a stock split or other similar event. We do not grant stock options with a so-called "reload" feature, nor do we generally loan funds to employees to enable them to exercise stock options. Our long-term performance ultimately determines the value of stock options, because gains from stock option exercises are entirely dependent on the long-term appreciation of our stock price. The stock options granted by the Compensation Committee to employees are generally exercisable in equal installments on the first through the four anniversaries of the grant date and expire ten years from the grant date.

Because a financial gain from stock options is only possible after the price of the Company's common stock has increased, we believe grants encourage executives and other employees to focus on behaviors and initiatives that should lead to an increase in the price of Sunair common stock, which benefits all of the Company's shareholders. During fiscal 2008, we granted an aggregate of 438,500 options to our employees and directors, which include a grant of 130,000 options to our Named Executive Officers. On February 21, 2008, we granted 30,000 options to Edward Carriero, our Chief Financial Officer and 50,000 options to John Hayes, our former Chief Executive Officer, at an exercise price of $1.76 per share. On August 28, 2008, we granted 50,000 options to Jack I. Ruff, our Chief Executive Officer, at an exercise price of $2.03 per share. These options vest in equal installments on the first through four anniversaries of the grant date and expire in ten years from the grant date.

16

*No Backdating or Spring Loading:* The Company does not backdate options or grant options retroactively. In addition, we do not coordinate grants of options so that they are made before announcement of favorable information, or after announcement of unfavorable information. The Company's options are granted at fair market value on a fixed date or event, with all required approvals obtained in advance of or on the actual grant date. All grants to executive officers require the approval of the Compensation Committee. The timing of such grants is at the discretion of the Compensation Committee; however, traditionally, initial grants of options occur at the date of initial employment or on or about the date of our Annual Meeting of Shareholders.

Fair market value has been consistently determined as the closing price on the grant date. In order to ensure that its exercise price fairly reflects all material information without regard to whether the information seems positive or negative every grant of options is contingent upon a determination by the Compensation Committee that Sunair is not in possession of material undisclosed information. If we are in possession of such information, grants are suspended until the second business day after public dissemination of the information.

### Benefits

We offer our employees a variety of retirement, health and welfare, and paid time-off benefits designed to enable us to attract and retain our workforce in a competitive marketplace. Health and welfare and paid time-off benefits help ensure that we have a productive and focused workforce through reliable and competitive health and other benefits. Savings plans help employees, especially long-service employees, save and prepare financially for retirement.

Middleton's qualified 401(k) Plans allows highly compensated employees to contribute up to 15 percent of their compensation (base salary plus bonus payments), up to the limits imposed by the Internal Revenue Code which is $15,500 for 2008 (excluding any catch-up contributions, as allowed by the Internal Revenue Code) on a pre-tax basis. We provide matching contributions up to six percent of employee contributions, which vest immediately. Participants choose to invest their account balances from an array of investment options as selected by plan fiduciaries from time to time. The 401(k) Plans are designed to provide for distributions in a lump sum or in periodic installments after termination of service. However, loans and in-service distributions under certain circumstances such as a hardship, attainment of age $59^{1}/_{2}$ or a disability are permitted.

### Perquisites

We provide our Named Executive Officers with perquisites and other personal benefits that the Compensation Committee believes are reasonable and consistent with our overall compensation program to better enable us to attract and retain executive officer and key employees. During fiscal 2008, our Named Executive Officers were only provided participation in the plans and programs described above. None of our Named Executive Officers received any other perquisites or other benefits, which conferred a direct or indirect benefit having a personal aspect and which were not generally available to other employees.

We do not generally provide the Named Executive Officers with other perquisites such as reimbursement for legal, counseling for personal matters or tax reimbursement payments. We do not provide loans to executive officers.

17

**Summary Compensation Table**

The following Summary Compensation table sets forth information regarding compensation earned by, awarded to or paid to our Named Executive Officers during fiscal 2008.

### SUMMARY COMPENSATION

| Name and Principal Position | Year | Salary | Bonus | Option Awards(6) | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Jack I. Ruff — Chief Executive Officer(1) | 2008 | $ 65,625 | $ — | $ 2,580 | $ — | $ — | $ 68,205 |
| | 2007 | $ — | $ — | $ — | $ — | $ — | $ — |
| Edward M. Carriero, Jr. — Chief Financial Officer | 2008 | $161,667 | $ — | $ 23,428 | $ — | $ — | $185,095 |
| | 2007 | $134,698 | $ — | $ 18,395 | $ — | $ — | $153,093 |
| Colin Mulford — Chief Executive Officer of Telecom FM(2) | 2008 | $284,151 | $ — | $ — | $ — | $ — | $284,151 |
| | 2007 | $304,241(3) | $304,241(4) | $ — | $ — | $ — | $608,482 |
| John J. Hayes — Former President and Chief Executive Officer(5) | 2008 | $288,947 | $ — | $ 11,841 | $ — | $ — | $300,788 |
| | 2007 | $324,056 | $ — | $142,086 | $ — | $ — | $466,142 |
| Gregory Clendenin — Former Chief Executive Officer of Middleton(7) | 2008 | $ — | $ — | $ — | $ — | 168,000(8) | $168,000 |
| | 2007 | $305,196 | $ — | $ 96,361 | $ — | —(8) | $401,557 |
| Charles Steinmetz — Former Chief Executive Officer of Middleton (9) | 2008 | $ — | $ — | $ — | $ — | $ — | $ — |
| | 2007 | $ — | $ — | $ — | $ — | $ — | $ — |

(1) Mr. Ruff joined as the Chief Executive Officer of the Company and Middleton, effective as of July 25, 2008.

(2) Mr. Mulford resigned as the Chief Executive Officer of Telecom FM, effective as of August 31, 2008, in connection with the sale of Telecom FM to a company organized and owned by its former executive management team.

(3) Based on the average exchange rates of 1.99 and 1.97 British pounds to one U.S. dollar for the periods from October 1, 2007 through September 30, 2008 and October 1, 2006 through September 30, 2007, respectively.

(4) Represents amounts received by Mr. Mulford under the Telecom FM Bonus Plan.

(5) Mr. Hayes' employment with the Company as its Chief Executive Officer was terminated without cause effective as of September 23, 2008.

(6) The amounts in this column do not reflect compensation actually received by the Named Executive Officer nor do they reflect the actual value that will be recognized by the Named Executive Officer. Instead the amounts reflect the compensation cost recognized by us in fiscal 2007 and 2008 for financial statement reporting purposes in accordance with SFAS 123R. For information regarding the assumptions made in calculating the amounts reflected in this column, see Footnote 10 — Stock Options, to our audited financial statements for the year ended September 30, 2008, included in our Annual Report on Form 10-K for the year ended September 30, 2008.

(7) Mr. Clendenin served as CEO of SSPH and Middleton from June 7, 2005 through October 29, 2007.

(8) Represents compensation that Mr. Clendenin received under his separation and consulting agreements dated October 29, 2007 with the Company.

(9) Mr. Steinmetz was appointed as Chief Executive Officer of Middleton effective as of January 18, 2008 and stepped down from this position on July 25, 2008. Mr. Steinmetz also serves as a board of director. These

18

amounts reflect the compensation associated to 50,000 shares that were granted to Mr. Steinmetz in February 2008 for services rendered as CEO.

### Employment Agreements

#### Current Executive Officers

*Jack I. Ruff.* On September 3, 2008, we entered into an employment agreement with Jack I. Ruff to serve as the Chief Executive Officer of and President of Sunair and Middleton, to be effective as of July 25, 2008 for a term of three years, unless otherwise terminated as specified therein. Under his agreement, Mr. Ruff will receive an annual salary of $350,000 per year and is eligible to receive bonuses based on Company's actual EBIDTA results compared to its budgeted EBIDTA results for each year. Any subsequent increases in Mr. Ruff's annual salary or bonuses will be determined by the Company in its sole discretion. Mr. Ruff is entitled to participate in any bonus plan, incentive compensation program, incentive stock option program or other benefits which are available to other similar situated executives of the Company. His employment agreement contains customary confidentiality and non-competition provisions.

Mr. Ruff's employment agreement is for a term of three years from July 25, 2008, unless otherwise terminated as specified therein. If the Company terminates the employment of Mr. Ruff without good cause or if Mr. Ruff terminates his employment with good cause, the Company shall pay Mr. Ruff severance compensation calculated at the rate of his salary in effect as of the date immediately preceding the date of termination and the cost of premiums for any Company sponsored insurance policy (or the cash equivalent) as follows: (i) if terminated prior to the first anniversary of the effective date, Mr. Ruff shall be paid six months of severance compensation, (ii) if terminated after the first anniversary but before the second anniversary of the effective date Mr. Ruff shall be paid one year of severance compensation, and (iii) if terminated after the second anniversary, Mr. Ruff shall be paid two years of severance compensation Upon a Change in Control, any unvested stock options or restricted stock awards previously granted to Mr. Ruff will automatically vest. If Mr. Ruff terminates his employment for Good Cause within nine (9) months of a Change in Control, then Mr. Ruff will be entitled to the severance compensation equal to (i) one year if terminated after the first anniversary but before the second anniversary of the effective date and (ii) two years of severance compensation if terminated after the second anniversary of the effective date.

*Edward M. Carriero, Jr.* On August 1, 2008, we entered into an employment agreement with Edward M. Carriero, Jr., our Chief Financial Officer. Under his agreement, Mr. Carriero will receive an annual salary for $165,000 per year. He may receive increases in his annual salary and annual bonuses, as determined by the Company's Compensation Committee in its sole discretion. Mr. Carriero is entitled to participate in any bonus plan, incentive compensation program, incentive stock option or other employee benefits of the Company which are available to other similar situated executives of the Company, as determined by the Compensation Committee. His employment agreement contains customary confidentiality and non-competition provisions.

Mr. Carriero's employment agreement is for a term of two years from August 1, 2008, unless otherwise terminated as specified therein. If we terminate Mr. Carriero's employment agreement without good cause or Mr. Carriero terminates his employment agreement with good cause, we are required to pay Mr. Carriero a severance payment equal to one years salary. Upon a change in control, all options previously granted to Mr. Carriero will automatically vest and if he terminates his employment with us for good cause within one year after a change in control, he will be entitled to one year of severance payments.

### Former Named Executive Officers

*Colin Mulford.* We, through Telecom FM, entered into an employment agreement with Colin Mulford on October 5, 2004 in connection with the purchase of Telecom FM in which Mr. Mulford agreed to serve as the President of Telecom FM. The employment agreement provided for an initial term of three (3) years, which term may be automatically renewed for successive one (1) year terms, unless advance notice of nonrenewal is given by either party. The employment agreement provided for an annual base salary of One Hundred Thirty Thousand Pounds (£130,000) and participation by Mr. Mulford in all benefit programs made available to our other executive officers. We could terminate Mr. Mulford's employment without cause by providing one year's prior notice, and we reserved the right to make a payment in lieu of notice or of any unexpired period of notice. The employment

19

-73

-73ocr

73 of 93

DEF 14A

73 of 93

Case 9:09-cv-80438-JIC   Document 1   Entered on FLSD Docket 03/18/2009   Page 73 of 93

2/6/2009

agreement also included non-competition and non-solicitation covenants lasting for a term of one (1) year after termination. Pursuant to his employment agreement, if Telecom FM terminates Mr. Mulford's employment agreement without cause and without giving Mr. Mulford one year prior written notice, it is required to pay Mr. Mulford a severance payment equal to one years salary.

On September 30, 2008, we sold the outstanding shares of Telecom FM effective as of September 1, 2008 to a company organized and owned by the former executive management team of Telecom FM. As a result of the sale of the outstanding shares of Telecom FM, we no longer have any obligations to Mr. Mulford under his employment agreement.

*John J. Hayes.*  On July 25, 2008, we sent John Hayes, our former Chief Executive Officer and President, notice that his employment with the Company was being terminated without cause, effective as of September 23, 2008. Mr. Hayes had been employed by the Company pursuant to a written employment agreement dated March 29, 2005. Mr. Hayes will receive severance compensation at the rate of his salary in effect on September 23, 2008, plus the cost of premiums for any Company sponsored insurance policies (or the cash equivalent) for 24 months, payable in accordance with the Company's normal payroll practices.

*Gregory Clendenin.*  In connection with his resignation, the Company and Mr. Clendenin entered into a separation and release agreement ("Separation Agreement"), effective as of October 29, 2007. Under the Separation Agreement, the Company paid Mr. Clendenin a severance payment equal to $76,500 over a six month period plus $15,000 over a six month period for reimbursement of COBRA payments. The Separation Agreement provided that Mr. Clendenin would have 12 months to exercise his 23,812 vested options, which is consistent with the terms of the Company's 2004 Stock Incentive Plan. In exchange, Mr. Clendenin waived any claims that he may have against the Company, Middleton, the Company or any affiliated companies in connection with his employment and (ii) acknowledging that certain obligations under his employment agreement and the Purchase Agreement, which by their terms survived the closing of the Purchase Agreement continued to apply to him. These obligations include, but are not limited to, Mr. Clendenin's covenant not to compete against the Company and not to solicit or hire current or former employees of the Company until the restricted period expires on June 6, 2010, his covenant regarding the non-disclosure of confidential information and the return of confidential materials to the Company.

In addition, the Company and Mr. Clendenin entered into a consulting agreement ("Consulting Agreement") in which Mr. Clendenin agreed to provide consulting services to the Company during the twelve month period (the "Term") after his resignation. The Company paid Mr. Clendenin an aggregate of $76,500 for consulting services under the Consulting Agreement during fiscal 2008.

### 2004 Stock Option Plan

Effective as of February 4, 2005, our Board of Directors and shareholders approved our 2004 Stock Plan. We reserved an aggregate of 800,000 shares of common stock for issuance under the this Plan which provides for the grants of stock options (incentive and non-qualified), restricted stock, restricted stock units, performance shares, performance units, stock awards and other stock based awards to directors, officers and key employees. During fiscal 2008, we granted an aggregate of 438,500 options to our employees and directors, which include a grant of 130,000 to our Named Executive Officers.

### Outstanding Equity Awards At Fiscal Year-End; Option Exercises and Stock Vested

The following Outstanding Equity Awards at fiscal year end table summarizes the holdings held by our Named Executive Officers as of September 30, 2008.

20

## OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END

| | Option Awards | | | |
| --- | --- | --- | --- | --- |
| | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable | Option Exercise Price | Option Expiration Date |
| Jock J. Ruff | — | 50,000(1) | $ 2.03 | 2/28/2016 |
| | 8,750(2) | 8,750 | $ 6.09 | 2/06/2014 |
| Edward M. Carriero, Jr. | 0 | 30,000(3) | $ 1.76 | 2/21/2016 |
| Colin Mulford | — | — | — | — |
| John J. Hayes | 125,000(4) | — | $ 5.00 | 11/16/2014(4) |
| Gregory A. Clendenin | 23,812 | —(5) | $11.40 | 06/07/2013 |
| Charles Steinmetz | 5,000(6) | — | $ 5.60 | 12/13/2013 |
| | 5,000(7) | — | $ 3.23 | 02/05/15 |
| | — | 5,000(8) | $ 1.76 | 02/19/16 |

(1) Options were granted on August 28, 2008 and vest 25% per year over a 4 year period beginning on August 15, 2009.

(2) Options were granted on February 6, 2006 and vested 25% per year over a 4 year period beginning on February 6, 2007.

(3) Options were granted on February 21, 2008 and vest 25% per year over a 4 year period beginning on February 21, 2009.

(4) In connection with Mr. Hayes' termination of employment, these options expired on October 23, 2008.

(5) Options vested as to 50% of the underlying shares on June 7, 2007. Mr. Clendenin resigned from the Company on October 29, 2007. Pursuant to his separation agreement, the 23,813 vested options expired on October 29, 2008.

(6) Options vested as to 100% of the underlying shares on December 15, 2006.

(7) Options vested as to 100% of the underlying shares on February 7, 2008.

(8) Options were granted on February 21, 2008 and vest 100% as of February 21, 2009.

### Option Exercises and Stock Vested

During fiscal 2008, none of Our Named Executive Officers exercised any stock options or other derivative securities and no stock awards vested.

### Pension Benefits

None of our Named Executive Officers participate in or have account balances in qualified or non-qualified defined pension benefit plans sponsored by us.

### Nonqualified Deferred Compensation

None of our Named Executive Officers participate in or have account balances in non-qualified defined contribution plans or other deferred compensation plans maintained by us. The Compensation Committee, which is comprised solely of outside directors as defined for purposes of Section 162(m) of the Internal Revenue Code, may elect to provide our officers and other employees with non-qualified defined contribution or deferred compensation benefits if the Compensation Committee determines that doing so is in our best interests.

21

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**Family Relationships**

There is no family relationship between or among any of our directors and executive officers.

**Related Transactions**

As described under the caption "Certain Voting Arrangements" on page 11, between August 31, 2005 and October 17, 2008, one of our shareholders, Coconut Palm distributed an aggregate of 4,843,698 shares of our common stock plus warrants to purchase 4,964,499 additional shares of common stock to certain of its limited partners in exchange for the redemption of their respective limited partnership interests. In accordance with Coconut Palm's limited partnership agreement, Coconut Palm's limited partners who had requested redemption paid to Coconut Palm an aggregate of $28,000 for legal fees incurred by Coconut Palm in connection with the redemption of the limited partnership interests. Coconut Palm's limited partners include Messrs. Brauser, Ferrari, Hayes, Rochon and Schmitt. In connection with the distributions of shares, Coconut Palm's limited partners granted to Coconut Palm, Inc., the general partner of Coconut Palm, a proxy to vote, in its sole discretion, a significant portion of the securities owned by the limited partners at any meeting of the Company's shareholders, as well as in any action by written consent of the Company's shareholders.

Effective upon the closing of the Coconut Palm transaction, which is described upon the caption "Change in Control" beginning on page 12, we entered into a management services agreement ("Management Services Agreement") with an affiliate of Coconut Palm, RPC Financial Advisors, LLC ("RPC") for a period of three years, which was amended on March 31, 2006. On January 7, 2008, the Company entered into a management services agreement (the "Amended Management Services Agreement") with RPC, which supersedes and replaces the prior Management Services Agreement. The Amended Management Services Agreement will be for a term of three years, commencing on February 8, 2008 and expiring on February 7, 2011. The Company will pay RPC a monthly management fee equal to one (1%) of the monthly gross revenues of the Company, which will be payable monthly based on the average monthly revenues of the preceding quarter. RPC will also receive a transaction fee of up to 2% of the Aggregate Consideration receive by the Company in a Transaction (as such capitalized terms are defined in the Management Services Agreement). Pursuant to the Management Services Agreement, RPC will provide the Company with services similar to those provided in the Previous Management Services Agreement. After the initial term of three years, the Management Services Agreement will automatically renew for successive one year terms, unless either RPC or the Company terminates the agreement upon 30 days notice. We paid RPC management fees in the aggregate amount of $1,038,012 and $1,488,219 in fiscal 2008 and fiscal 2007, respectively. Richard C. Rochon and Mario B. Ferrari, both of whom are affiliates of Coconut Palm and each of whom are members of our Board of Directors and principal shareholders of our company, are also affiliates of RPC. Jack Ruff, our CEO, is a director and greater than 10% shareholder of RPC.

On June 7, 2005, our subsidiary, SSPH, acquired all of the outstanding stock of Middleton from the Middleton shareholders. The aggregate consideration paid consisted of: (i) $35.0 million in cash; (ii) $5.0 million in the form of a subordinated promissory note; and (iii) 1,028,807 shares of our common stock (collectively, the "Transaction Consideration"). The Transaction Consideration was allocated pro rata among the shareholders of Middleton. As shareholders of Middleton, Charles Steinmetz and certain irrevocable family trusts (collectively, the "Steinmetz Trusts") received 823,046 shares of our common stock, $28.0 million cash and $4.0 million principal amount of a subordinated promissory note in exchange for their shares of Middleton in connection with the acquisition. In connection with the completion of the acquisition of Middleton, Mr. Steinmetz became a director of our Company. The subordinated note bears interest at an annual rate equal to the prime rate as reported from time to time in the Wall Street Journal. During fiscal 2008 and 2007, the Steinmetz Trusts were paid an aggregate of $274,630 and $288,867, respectively.

We entered into a Share Purchase Agreement on September 30, 2008, pursuant to which we agreed to sell all of the issued and outstanding common stock of Telecom FM, our wholly-owned subsidiary which operates in the telephone communications business, to Telecom FM Holdings Limited, a company organized and owned by the former executive management team of Telecom FM. The transaction was completed on September 30, 2008 with an

22

effective date of September 1, 2008. The aggregate purchase price paid to the Company for Telecom FM was $3,613,583, which included the payment of outstanding inter-company debt in the amount of $1,213,583. Colin Mulford, who served as the Chief Executive Officer of Telecom FM when it was owned by the Company will continue to serve as the Chief Executive Officer of Telecom FM under its new ownership. In connection with the Share Purchase Agreement, the Company has agreed to certain restrictions on competition and non-solicitation during the three (3) year period after September 30, 2008

**Policies and Procedures Regarding Review, Approval or Ratification of Related Person Transactions**

In accordance with our Audit Committee Charter, our Audit Committee is responsible for reviewing and approving the terms and conditions of all related party transactions. Any material financial transaction with one of our officers or directors or their immediate family members would need to be approved by our Audit Committee prior to us entering into such transaction. A report is made to our Audit Committee annually disclosing all related parties that are employed by us and related parties that are employed by other companies that we had a material relationship with during that year, if any.

## INDEPENDENT PUBLIC ACCOUNTANTS

The firm of Berenfeld Spritzer Shechter & Sheer was designated by our Board of Directors to audit the financial statements of our Company and our subsidiaries for the fiscal year ended September 30, 2008. The firm and its predecessor, Puritz & Weintraub, has been our independent public accountants since 1985.

Representatives of Berenfeld Spritzer Shechter & Sheer are expected to be present at the Annual Meeting. They will have an opportunity to make a statement if they desire to do so and will be available to respond to appropriate questions.

The Audit Committee pre-approves the engagement of Berenfeld Spritzer Shechter & Sheer for all professional services. The pre-approval process generally involves the full Audit Committee evaluating and approving the particular engagement prior to the commencement of services.

### Audit Fees

The following table presents fees for professional services rendered by our independent registered public accounting firms, Berenfeld, Spritzer, Shechter & Sheer ("BSS&S") for the audit of our annual consolidated financial statements for the years ended September 30, 2008 and 2007, together with fees billed for other services rendered by the firms during those periods.

|  | 2008 | 2007 |
|---|---|---|
| Audit Fee | $284,702 | $325,290 |
| Audit-Related Fees | 46,028 | 62,233 |
| Tax Fees | 47,500 | 45,260 |
| All Other Fees | 117,119 | 87,780 |
| Total Fees | $495,349 | $520,563 |

(1) Audit fees consist principally of the audit of the consolidation financial statements included in our annual report on Form 10-K and the review of the interim condensed consolidation financial statements included in our quarterly reports on Form 10-Q.

(2) Audit-related fees include audit of our 401k plan, review of our 8-K filings, proxy statement, and reviews and audits related to acquisitions and dispositions.

23

*Audit-Related Fees; Tax Fees; Financial Information Systems Design and Implementation Fees; All Other Fees*

All audit-related services, tax services and other services were pre-approved by the Audit Committee, which concluded that the provision of these services by BSS&S was compatible with the maintenance of the firms' independence in the conduct of auditing functions. The Audit Committee's charter provides the Audit Committee with authority to pre-approve all audit and allowable non-audit services to be provided to us by our external auditors.

In its performance of these responsibilities, prior approval of some non-audit services is not required if:

(i) these services involve no more than 5% of the fees paid by us to our auditors during the fiscal year;

(ii) these services were not recognized by us to be non-audit services at the time of the audit engagement; and

(iii) these services are promptly brought to the attention of the Audit Committee and are approved by the Audit Committee prior to completion of the audit for that fiscal year.

The Audit Committee annually reviews the performance of its independent registered public accounting firm and the fees charged for its services.

The Audit Committee of our Board of Directors has considered whether the provision of the above-described services is compatible with maintaining BSS&S's independence and believes the provision of such services is not incompatible with maintaining this independence.

## OTHER BUSINESS

Our Board of Directors knows of no other business to be brought before the Annual Meeting. If, however, any other business should properly come before the Annual Meeting, the persons named in the accompanying proxy will vote proxies as in their discretion they may deem appropriate, unless they are directed by a proxy to do otherwise. Discretionary authority to vote on such matters is conferred only by the granting of such proxies.

24

## OTHER INFORMATION

*Shareholder Proposals for the 2010 Annual Meeting of Shareholders*

The deadline by which shareholder proposals must be submitted for inclusion in our proxy statement for our next Annual Meeting of Shareholders is October 5, 2009 under Rule 14a-8 of the Securities and Exchange Act of 1934. Additionally, we must receive notice of any shareholder proposal to be submitted at the next Annual Meeting of Shareholders (but not required to be included in our proxy statement for that meeting) by December 19, 2009, or such proposal will be considered untimely pursuant to Rule 14a-5(e) under the Securities Exchange Act of 1934 and persons named in the proxies solicited by management may exercise discretionary voting authority with respect to such proposal.

*Annual Report*

A copy of our Annual Report on Form 10-K for the fiscal year ended September 30, 2008, except for the exhibits, accompanies this proxy statement and is incorporated in this proxy statement by reference. Upon request, we will provide copies of the exhibits to the Annual Report on Form 10-K at no additional cost. All requests should be directed to our Corporate Secretary c/o Sunair Services Corporation, 595 South Federal Highway, Suite 500, Boca Raton, Florida 33432.

*Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to Be held On May 9, 2008*

The Proxy Statement for our Annual Meeting of Shareholders to be held on March 18, 2009 and our Annual Report on Form 10-K for fiscal 2008 is available at *http://www.amstock.com/ProxyServices/ViewMaterials.asp.*

By Order of the Board of Directors,

/s/ JACK I. RUFF

Jack I. Ruff
President and Chief Executive Officer

Boca Raton, Florida
January 28, 2009

25

DEF 14A

ANNUAL MEETING OF SHAREHOLDERS OF

# SUNAIR SERVICES CORPORATION

### March 18, 2009

Please sign, date and mail
your proxy card in the
envelope provided as soon
as possible.

↓ Please detach along perforated line and mail in the envelope provided. ↓

■ 20730000000000000000  5                           031809

THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "FOR" EACH OF THE PROPOSALS SET FORTH BELOW.
PLEASE SIGN, DATE AND RETURN PROMPTLY IN THE ENCLOSED ENVELOPE. PLEASE MARK YOUR VOTE IN BLUE OR BLACK INK AS SHOWN HERE [X]

1. PROPOSAL 1: To elect the seven nominees listed in the Proxy Statement to the Company's Board of Directors, each to serve until the next Annual Meeting of Shareholders or until their successors have been duly elected and qualified.

NOMINEES:
- ○ Joseph S. DiMartino
- ○ Mario B. Ferrari
- ○ Arnold Heggestad, Ph.D.
- ○ Steven P. Oppenheim
- ○ Richard C. Rochon
- ○ Charles P. Steinmetz
- ○ Robert C. Griffin

FOR ALL NOMINEES  
WITHHOLD AUTHORITY FOR ALL NOMINEES  
FOR ALL EXCEPT (See instructions below)

2. PROPOSAL 2: To act upon such other business as may properly come before the Annual Meeting and any and all adjournments or postponements thereof.

THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED IN THE MANNER DIRECTED HEREIN BY THE UNDERSIGNED SHAREHOLDER. IF NO DIRECTION IS MADE, THIS PROXY WILL BE VOTED "FOR" EACH OF THE PROPOSALS.

The undersigned hereby revokes any proxy or proxies heretofore given, and ratifies and confirms that the proxies appointed hereby, or any of them, or their substitute or substitutes, may lawfully do or cause to be done by virtue thereof. The undersigned hereby acknowledges receipt of a copy of the Notice of Annual Meeting of Shareholders and Proxy Statement, both dated January 28, 2009, and the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2008.

INSTRUCTIONS: To withhold authority to vote for any individual nominee(s), mark "FOR ALL EXCEPT" and fill in the circle next to each nominee you wish to withhold, as shown here: ●

To change the address on your account, please check the box at right and indicate your new address in the address space above. Please note that changes to the registered name(s) on the account may not be submitted via this method. ☐

Signature of Shareholder _____ Date: _____   Signature of Shareholder _____ Date: _____

Note: Please sign exactly as your name or names appear on this Proxy. When shares are held jointly, each holder should sign. When signing as executor, administrator, attorney, trustee or guardian, please give full title as such. If signer is a partnership, please sign in partnership name by authorized person.

DEF 14A

☐                    ▓

# SUNAIR SERVICES CORPORATION

PROXY

ANNUAL MEETING OF SHAREHOLDERS - MARCH 18, 2009

*THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS*

The undersigned does hereby appoint EDWARD M. CARRIERO, JR. and JACK I. RUFF, and each of them, the true and lawful attorneys and proxies with full power of substitution, for and in the name, place and stead of the undersigned, to vote all of the shares of common stock of SUNAIR SERVICES CORPORATION ("Company"), which the undersigned would be entitled to vote if personally present at the Annual Meeting of Shareholders to be held on March 18, 2009, at 11:00 a.m., local time, at the Hilton Hotel, 100 Fairway Drive, Deerfield Beach, Florida, 33441, and at any adjournment(s), or postponement(s) thereof.

(Continued and to be signed on the reverse side.)

▓                                                                    14475 ▓

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NUMBER: 50 2009 CA 006340 XXXXMB

Michael Brauser, an individual; Dru Schmitt,
an individual; and Michael Herman, an
individual,

      Plaintiffs,

v.

Sunair Services Corporation; Coconut Palm
Capital Investors II. Ltd.; and Coconut Palm
Capital Investors II, Inc.

      Defendants

3/9/09

10:55P

All-State Process Services, Inc.,
13015 S.W. 89 Place, Suite 221
Miami, Florida 33176
(305) 971-9636  Fax (305) 235-7072
www.process-service.net

## PLAINTIFFS' MOTION FOR IMMEDIATE INJUNCTIVE RELIEF

Pursuant to Rule 1.610 of the Florida Rules of Civil Procedure, plaintiffs, Michael Brauser, an individual ("Mr. Brauser"); Dru Schmitt, an individual ("Mr. Schmitt"); and Michael Herman, an individual ("Mr. Herman"), move the Court for immediate injunctive relief against defendants, Sunair Services Corporation ("Sunair"), Coconut Palm Capital Investors II, Ltd. ("Coconut Palm"), and Coconut Palm Capital Investors II, Inc. ("Coconut, Inc.").

### Introduction

Plaintiffs need immediate injunctive relief to: i) end the dissemination of false and misleading statements by Sunair current management to Sunair shareholders in connection with a planned shareholder meeting set by Sunair management for March 18, 2009 ("Meeting"); ii) order Sunair to give plaintiffs a set of pre-addressed, mailing labels to Sunair shareholders so

{972500107691.4}

1

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL (305) 374-5030 • FAX (305) 374-5033

82 of 93

plaintiffs can meet the requirements of the Sunair Bylaws, Florida corporate law and SEC filing regulations; iii) prevent wrongful exercise of two proxies on behalf of Mr. Brauser and Mr. Schmitt at the Meeting; and iv) cancel the Meeting so plaintiffs can act to replace the present Sunair Board of Directors ("Board").

Plaintiffs consider they have oral agreements with holders of more than 50% of the Outstanding Stock of Sunair, and thereby are entitled to change the Sunair Board.  For the Meeting, present Sunair management scheduled a vote on Sunair management's nominees for reelection to the Board.  In connection with the vote, Sunair filed false and misleading information with the SEC and transmitted false information to Sunair shareholders.  This needs to stop.  Also at the Meeting, defendant Coconut Palm (and thereby, defendant Coconut, Inc.) will vote proxies it claims it has from Mr. Brauser and Mr. Schmitt.  To date, Sunair management thwarted plaintiffs' efforts under the Sunair Bylaws to take action at a Special Meeting or by consent, to change Board members.  For a Special Meeting or for consents, plaintiffs need Sunair to turnover a complete list of all shareholders of Sunair, as of a date certain, together with pre-addressed mailing labels to each shareholder.  Sunair refused.

<u>Facts</u>

## <u>Plaintiffs Have Undertakings of Support from 54% of the Sunair Shareholders</u>

As detailed in the plaintiffs' complaint and in the affidavits that will be filed in support of this motion, plaintiffs each own approximately ten percent of the stock of Sunair: i) Mr. Brauser has beneficial ownership of 1,403,300 shares of Sunair, representing approximately 10.2% of the 13,091,088 shares of Sunair presently outstanding among shareholders of Sunair ("Outstanding Shares"); ii) Mr. Herman resides in Colorado Springs, CO and has beneficial ownership of 2,180,600 shares of Sunair, representing approximately 16.7% of the Outstanding Shares; and iii)

{972500107691.4}

<p style="text-align:center">2</p>

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

Mr. Schmitt resides in St. Louis, MO and has beneficial ownership of 1,486,014 shares of Sunair, representing approximately 11.1% of the Outstanding Shares.  Together, Mr. Brauser, Mr. Schmitt and Mr. Herman beneficially own 31.9% of the outstanding common stock (without giving effect to the exercise of warrants they hold).

In addition, of the 13,091,088 total votes for Sunair shareholders, holders of 7,063,918 votes or approximately 54% of the outstanding voting power, have orally agreed to execute a written consent to approve the removal of the present Board directors and appointment of new directors.

### Sunair is Giving Misleading Information to Sunair Shareholders

At the Meeting, Sunair proposes a slate of candidates for reelection to the Board, including present director, Richard C. Rochon ("Mr. Rochon").  In connection with the Meeting, Sunair distributed written materials to Sunair shareholders that contain the following misrepresentations and omissions of material fact:

(a) Mr. Rochon is depicted by the Sunair materials as having a long-standing professional and personal relationship with well-known South Florida financier, H. Wayne Huizenga ("Mr. Huizenga");

(b) Sunair does not disclose that Mr. Huizenga sued Mr. Rochon in 2006 for over $10 million stemming from loans that Mr. Rochon has not repaid;

(c) Sunair does not disclose that Mr. Rochon was sued in December 2008 for foreclosure on a $12.5M mortgage upon which Mr. Rochon has not made any payments since August 2008;

(d) Sunair makes references to Mr. Rochon's his role as a director of Devcon, described as "a publicly-held company", but which ceased filing reports with the SEC in October 2008;

(972500107691.4)

3

(e) Sunair reports that Mr. Rochon was Chairman and CEO of Coconut Palm Acquisition Company until June 2007, but omits to disclose that Royal Palm, hired by present Sunair management as a management firm for Sunair, has a $1,500,000 management agreement with Coconut Palm Acquisition Company, nor that Coconut Palm Acquisition Company has been known as Equity Media since April 2007, nor that Equity Media filed Chapter Eleven in December 2008; and

(f) Sunair identifies Sunair Director Mario Ferrari ("Mr. Ferrari"), another Royal Palm partner with Mr. Rochon, as chief strategic officer of Equity Media, but fails to report that Equity Media filed Chapter Eleven Bankruptcy in December 2008.

## Coconut Palm Will Wrongfully Vote At Least Two Proxies

Irrevocable proxies were allegedly given to Coconut Palm by Mr. Brauser, Mr. Schmitt and others. Requests for copies of the proxy were ignored by Sunair's counsel. A copy of the form proxy that Sunair filed with the SEC is attached to the complaint.

The proxy filed with the SEC provides for automatic revocation if the shares are transferred. Transfer, as defined by the proxy, includes an offer to sell. Based upon the language of the proxy filed by Sunair with the SEC, the proxy automatically is revoked when the shares are transferred or when any of the holders offer their shares to any third party.

Mr. Brauser and Mr. Schmitt (and others) offered their shares for sale to Massey Services, Inc.. According to the proxy Sunair filed with the SEC, this act automatically revokes the proxy, if any such proxy was ever executed. In addition, Mr. Brauser's shares were transferred from the original entity through which he purchased the stock, thereby making another "transfer" under the terms of the proxy.

(972500107691.4)

4

HALL LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 .TEL (305) 374-5030 . FAX (305) 374-5033

### Plaintiffs Need a Record Date List of Shareholders for Shareholders Notification of Special Meetings Under Sunair's Bylaws

Sunair Bylaws Article Two, Section Three provides that any shareholder holding not less than ten percent of all shares entitled to vote at a meeting may call a Special Meeting, and in the event of a Special Meeting, a written or printed notice to shareholders shall be delivered to shareholders not less than ten days before the date of the Special Meeting.  Sunair Bylaws Article Two, Section Four further provides that in the event of a Special Meeting, the required shareholder notice shall state the place, day and hour of the Special Meeting, as well as the purpose or purposes for which the Special Meeting has been called.

Sunair Bylaws Article Two, Section 14 provides that for purposes of determining the shareholders entitled to vote at a meeting of shareholders, the Board may fix a date as the record date that is not less than ten days prior to the date for the particular action to be taken ("Record Date").  A shareholder list is needed of shareholders as of a Record Date which reflects those shareholders entitled to vote at the Special Meeting contemplated by plaintiffs.  Determination as to who is a shareholder of record is not made until the end of a business day chosen as the Record Date.

Such a notification involves a mailing to almost 400 shareholders.  It is burdensome if not impossible to comply with the end-of-the-business-day demarcation for the Record Date and still get the notification out to all shareholders of record on the Record Date.  This effectively means that no action can be taken by consent of the majority of shareholders unless Sunair agrees to supply a list on the record date with pre-addressed mailing labels.  Plaintiffs need pre-addressed mailing labels for the Record Date shareholders to meet the requirements of the Bylaws.

{97250010769.4}

5

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

## Legal Argument

### Florida Law on Injunctive Relief

An injunction may be entered if the party seeking the injunction establishes the following criteria: (1) the likelihood of irreparable harm; (2) the unavailability of an adequate remedy at law; (3) a substantial likelihood of success on the merits; and (4) considerations of the public interest. Rollins, Inc. v. Parker, 755 So. 2d 839, 841 (Fla. 5th DCA 2000) (citing City of Oviedo v. Alafaya Utils., Inc., 704 So. 2d 206 (Fla. 5th DCA 1998); Miami-Dade County v. Church &Tower, Inc., 715 So. 2d 1084 (Fla. 3rd DCA 1998); St. Lucie County v. Town of St. Lucie Vill., 603 So. 2d 1289 (Fla. 4th DCA), review denied, 613 So. 2d 12 (Fla. 1992)).

The purpose of an injunction is not to resolve disputes, but rather to prevent irreparable harm by maintaining status quo until a final hearing can occur when full relief may be given. Michele Pommier Models, Inc. v. Diel, 886 So. 2d 993, 996 (Fla. 3rd DCA 2004)(citing to Grant v. Robert Half Int'l., Inc., 597 So. 2d 801 (Fla. 3rd DCA 1992)). The primary purpose of entering a temporary injunction is to preserve the status quo pending the final outcome of a case. Florida Land Co. v. Orange County, 418 So. 2d 370, 372 (Fla. 5th DCA 1982) (citing Adoption Hot Line, Inc. v. State, Dep't of Health & Rehabilitative Servs. ex rel. Rothman, 385 So. 2d 682 (Fla. 3rd DCA 1980)); see also City of Ormond Beach; Brock v. Brock, 667 So.2d 310 (Fla. 1st DCA 1995).

### The Court Should Enjoin Misrepresentations by Sunair to Shareholders

Sunair shareholders are being misled about Mr. Rochon and his management team. This will almost certainly do shareholders irreparable harm as their investments are in jeopardy. There is no remedy at law for this wrongful conduct that can be remedied by damages. In determining whether damages would be an adequate remedy courts look at the impact that the challenged action, if not enjoined, would have on others. For example, in Dotolo v. Schouten,

(972500107691.4)

6

426 So. 2d 1013 (Fla. 2d DCA 1983), the court held that "prevention of continuing wrongs is a well recognized basis for injunctive relief". *Id.* at 1015 (citing 29 Fla.Jur.2d Injunctions § 15; 22 Fla.Jur.2d Equity §§ 15, 16).

Substantial likelihood of success on the merits is established "if good reasons for anticipating the result are demonstrated" in that the petition for injunctive relief or the pleadings of the case must set forth a "prima facie, clear legal right to the relief requested." *See* City of Jacksonville v. Naegiele Outdoor Advertising Co., 634 So. 2d 750, 753 (Fla. 1st DCA 1994). The facts recited in the affidavits in support of the instant motion show a substantial likelihood of success on the merits.

As to the public interest, the public has an interest in protecting legitimate business interests. East v. Aqua Gaming, Inc., 805 So.2d 932, 934 (Fla. 2d DCA 2001). It will serve the public interest if full, fair and honest disclosure is made in the documents filed with the SEC and disseminated to Sunair shareholders.

Florida Courts will often defer to Delaware corporate law. *See, e.g.*, Int'l Ins. Co. v. Johns, 874 F.2d 1447, n. 22 (11th Cir. 1989)(stating "We rely with confidence upon Delaware law to construe Florida corporate law. The Florida courts have relied upon Delaware corporate law establish their own corporate doctrines.") *citing* Davidson v. Ecological Science Corp., 266 So. 2d 71 (Fla. 3rd D.C.A. 1972; De La Rosa v. Tropical Sandwiches, Inc., 298 So. 2d 471 (Fla. 3rd D.C.A. 1974); Naples Awning & Glass, Inc. v. Cirou, 358 So. 2d 211 (Fla. 2nd .D.C.A. 1978).

In the event of misrepresentations in connection with a shareholder vote, Delaware Courts have held:

{972500107691.4}

7

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

88 of 93

The threat of an uniformed stockholder vote constitutes irreparable harm. "[I]t is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected." Otherwise this Court is forced to engage in an imprecise and inefficient method by which to remedy disclosure deficiencies. Especially where, as is the case here, the Court must "unscramble the eggs" and conduct a post-hoc reorganization of a standing board. For these reasons, the Court should enter an injunction against Sunair, the Board and management enjoining them from making misstatements and omissions of material fact to Sunair shareholders.

QDS Technologies, L.P v. Marshall, 832 A.2d 1254, 1262-3 (Del. Ch. 2003). For these reasons, this Court should enter an injunction against Sunair, the Board and management enjoining them from making misrepresentations and omissions of fact to Sunair shareholders.

## The Court Should Enjoin Sunair's Refusal to Tender a Shareholder List and Labels.

Florida law provides that a shareholder may inspect the types of records specified by Florida Statutes Section 607.1602(2) only if the requirements of subsection (3) are met. Florida Statutes Section 607.1602(3) provides:

3. A shareholder may inspect and copy the records described in subsection two only if:

a. The shareholder's demand is made in good faith and for a proper purpose;

b. The shareholder describes with reasonable particularity his or her purpose and the records he or she desires to inspect; and

c. The records are directly connected with the shareholder's purpose.

Florida Statutes Section 607.1604 provides that a Florida Court may order the inspection of shareholder records upon an application by a shareholder:

(1) If a corporation does not allow a shareholder who complies with s. 607.1602 (1) or (4) to inspect and copy any records required by that subsection to be available for inspection, the circuit court in the county where the corporation's principal office (or, if none in this state, its registered office) is located may summarily order inspection and copying of the records demanded at the corporation's expense upon application of the shareholder.

(972500107691.4)

8

NALL LAMB AND HALL, P.A., PENTHOUSE ONE, 2655 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 ·TEL. (305) 374-5030 · FAX (305) 374-5033

Section 1604(2) provides that a Court "shall dispose of an application under this subsection on an expedited basis."

> (2) If a corporation does not within a reasonable time allow a shareholder to inspect and copy any other record, the shareholder who complies with s. 607.1602 (2) and (3), may apply to the circuit court in the county where the corporation's principal office (or, if none in this state, its registered office) is located for an order to permit inspection and copying of the records demanded. The court shall dispose of an application under this subsection on an expedited basis.

Plaintiffs have made the request for these documents in connection with their efforts to change the membership of the Sunair Board. These provisions of Florida law on inspection of corporate documents by shareholders come from the Model Business Corporation Act. Cases in other jurisdictions that have considered the issue have all held that a request has a "proper purpose" if it is made for a management change. *See e.g.* Hanrahan v. Puget Sound Power & Light Co., 126 N. E.2d 499, 503-4 (Mass. 1955).

For these reasons, the Court should enter an injunction against Sunair, the Board and management enjoining them from refusing to make a shareholder list available to plaintiffs as Sunair shareholders.

## The Court Should Enjoin Proxy Voting for Mr. Brauser or Mr. Schmitt.

"Invalidation of proxies falls within the Court's equity jurisdiction." Thaller v. Waterford Point Condominium Apartments, Inc., 421 So.2d 167, 169 (Fla. 4th DCA 1982); Belcher v. Schilling, 309 So.2d 32 (Fla. 3rd DCA 1975), cert. den. 318 So.2d 404 (Fla. 1975); Pearson v. First Fed. Savings & Loan Ass'n, 149 So.2d 891 (Fla. 2nd DCA 1963).

Mr. Brauser and Mr. Schmitt will be irreparably harmed if their vote is exercised by another without their permission. No legal remedy is available for such a wrong. The record before the Court demonstrates a substantial likelihood of success on the merits. Considerations

(972900107691.4)

9

of the public interest mitigate in favor of injunctive relief because the public interest is served by proper use of corporate proxies.

For these reasons, the Court should enter an injunction against Coconut Palm and Coconut, Inc. enjoining them from exercising the votes of Mr. Brauser and Mr. Schmitt by proxy.

## The Court Should Enjoin the Meeting

At the Meeting set for March 18, 2009 the Board plans to conduct business for Sunair contrary to the wishes of plaintiffs and the new directors that plaintiffs plan to elect to the Board. This is notwithstanding the fact that plaintiffs represent the wishes of a majority of the shareholders of outstanding shares of Sunair.

There is no good reason for the present Board of Directors to hold this planned meeting unless and until the membership issue on the Board of Directors is resolved. As the Delaware Chancery Court has held, the Court should enjoin votes based on misinformation because without an injunction, the Court will have to "'unscramble the eggs" and conduct a post-hoc reorganization of a standing board". QDS Technologies, supra.

## Conclusion

Immediate injunctive relief will end dissemination of false and misleading statements by Sunair's Board and current management to Sunair shareholders in connection with the Meeting and, in particular, the vote on Board members. With a set of pre-addressed, mailing labels to Sunair shareholders, plaintiffs can meet the requirements of the Sunair Bylaws and Florida corporate law to give the majority of the Sunair shareholders their voice in the corporate governance of Sunair. Injunctive relief will also prevent wrongful exercise of two proxies on behalf of Mr. Brauser and Mr. Schmitt at the Meeting. Cancelling a Meeting based on

{972500107691.4}

10

falsehoods will permit plaintiffs to replace the present Sunair Board by Special Meeting or by consent. Accordingly, plaintiffs seek injunctive relief from this Honorable Court.

DATED: March 6, 2009.

Respectfully submitted,

HALL, LAMB AND HALL, P.A.
Attorneys for Plaintiffs
Offices at Grand Bay Plaza
Penthouse One
2665 South Bayshore Drive
Miami, FL 33133

ANDREW C. HALL
Florida Bar Number: 111480
GARY LANGAN GOODENOW
Florida Bar Number: 466522

(9725000107601.4)

11

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

92 of 93

℠JS 44 (Rev 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM )   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS
MICHAEL BRAUSER, DRU SCHMITT, and MICHAEL HERMAN

**(b)** County of Residence of First Listed Plaintiff   Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name. Address, and Telephone Number)

Hall, Lamb and Hall, P.A
Penthouse One, 2665 South Bayshore Drive
Miami, FL 33133

## DEFENDANTS
SUNAIR SERVICES CORPORATION, COCONUT PALM CAPITAL INVESTORS, II, LTD., and COCONUT PALM

County of Residence of First Listed Defendant   Palm Beach
(IN U S PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED

Attorneys (If Known)

Gunster, Yoakley & Stewart, P A

(d) Check County Where Action Arose:  ☐ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☑ PALM BEACH   ☐ MARTIN   ☐ ST LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U S Government
     Plaintiff

☑ 3  Federal Question
     (U S Government Not a Party)

☐ 2  U S Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

*(handwritten)* 9:09 cv 80438 - Cohn-BSS

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl  Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☑ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | ☐ 730 Labor/Mgmt Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U S  Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 791 Empl  Ret Inc Security | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Act | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | Under Equal Access to  Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer  w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer  w/Disabilities - | ☐ 555 Prison Condition | Application | | Statutes |
| | Other | | ☐ 463 Habeas Corpus-Alien | | |
| | ☐ 440 Other Civil Rights | | Detainee | | |
| | | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1 Original
    Proceeding
☑ 2 Removed from
    State Court
☐ 3 Re-filed-
    (see VI below)
☐ 4 Reinstated or
    Reopened
☐ 5 Transferred from
    another district
    (specify)
☐ 6 Multidistrict
    Litigation
☐ 7 Appeal to District
    Judge from
    Magistrate
    Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions
second page):

a) Re-filed Case ☐ YES  ☐ NO        b) Related Cases ☑ YES  ☐ NO

JUDGE Marra/Johnson        09-80417   DOCKET NUMBER

## VII. CAUSE OF ACTION
Cite the U S  Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Preliminary injunction and declaratory judgment regarding claimed violations of Section 14 of the Securities Exchange Act of 1934 and various SEC rules under that Act and regarding certain voting proxies

LENGTH OF TRIAL via  3   days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F R C P 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   *(handwritten)* 3/17/09

FOR OFFICE USE ONLY

AMOUNT  *(handwritten)* 350 00     RECEIPT #     IFP

*(handwritten)* 545760